306 F.2d 292
 62-2 USTC P 9629
 A. Raymond JONES and Mary Lou Jones, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
COMMISSIONER OF INTERNAL REVENUE, Petitioner,
v.
DRILLING ACCESSORY AND MANUFACTURING CO., Inc., Respondent.
 No. 18764.
 United States Court of Appeals Fifth Circuit.
 July 19, 1962.
 
 Wentworth T. Durant, Ronald M. Mankoff, Dallas, Tex., for petitioners.
 Abbott M. Sellers, Acting Asst. Atty. Gen., Lee A. Jackson and Melva M. Graney, Attys., Dept. of Justice, Hart H. Spiegel, Chief Counsel, I.R.S., Claude R. Marshall, Special Atty., I.R.S., Burt J. Abrams, Atty., Dept. of Justice, Washington, D.C., for respondent.
 Before JONES, BROWN and GEWIN, Circuit Judges.
 GEWIN, Circuit Judge.
 
 
 1
 These consolidated cases[1] relate to the income tax liability of A. Raymond Jones (and his wife, Mary Lou)[2] for the years 1951 and 1953;[3] and the liability of Drilling Accessory & Manufacturing Company, Inc.,[4] (referred to as Drilling) resulting from a deficiency asserted by the Commissioner of Internal Revenue for the taxable year May 1, 1953 to January 31, 1954. Jones (sometimes referred to as taxpayers) filed petition for review in Case No. 75149; and the Commissioner seeks review in Case No. 75196 only to protect the revenue in the event the individual taxpayers, Jones, are held not to be taxable on the net proceeds of a judgment of the United States Court of Claims. The memorandum findings of fact and opinion related to both cases. Separate decisions were rendered and both were entered on the same date.
 
 
 2
 The problems to be resolved by this Court, broadly speaking, relate to an alleged anticipatory assignment of income; cash and accrual methods of accounting; the determination of whether certain income should be taxed as ordinary income or should be treated as long term capital gains; and other incidental problems relating to the foregoing. The solution of certain of the problems will extinguish others that arose in the Tax Court. We will try to summarize such facts as seem to be necessary to our decision and then discuss questions of law involved.
 
 
 3
 In 1943, the taxpayer, A. Raymond Jones, subcontracted from the general contractor, W. C. Shepherd, a portion of the construction work on a United States Army Corps of Engineers project known as the Cumberland Oil Field Protective Levee. Jones was engaged in the earth moving business as a sole proprietor at that time.
 
 
 4
 The Corps of Engineers changed the specifications on the project and the conditions of the job proved to be different from those represented to Jones. For these reasons Jones suffered a loss on his subcontract for the years 1943 and 1944 in excess of $350,000.00. During the course of the job, a Mr. A. J. Rife, a surety on Jones' bond, loaned him $450,000.00 to finance the completion of the subcontract. In 1944 and 1945, Jones sold and leased his equipment and from the proceeds repaid part of his debt to Rife. After part satisfaction of the debt, the balance, a sum of $265,958.13 was cancelled by Rife.
 
 
 5
 In 1944, the prime contractor, Shepherd, submitted a claim to the government for $1,235,833.65 additional compensation on the Cumberland Project, part of which claim related to services performed by Jones as subcontractor. Under the applicable Federal law, Jones had no direct recourse against the government, and could recover only through Shephers or Shepherd's surety.
 
 
 6
 During 1952, Jones ceased operating as a sole proprietor and transferred all of the assets of his business, except any rights he might have to additional compensation from the Dumberland project, to two corporations one of which was Drilling Accessory and Manufacturing Co., Inc. The stock of Drilling was owned by Jones and several key employees, Jones owning 67% of the stock.
 
 
 7
 On January 26, 1953 a Notice of Deficiency was sent to the taxpayers asserting a deficiency against them of $301,171.48 for taxes due in 1948, 1949 and 1950, years in which Jones had been in business as a sole proprietor and for which no tax returns had been filed. On February 3, 1953, Jones entered into a contract with Drilling whereby he assigned, sold, setover, transferred and conveyed all of his right, title or interest in and to the claim, or interest in the claim versus the United States (pending in the name of W. C. Shepherd), for reimbursement of losses sustained or for work and labor performed by Jones pursuant to his subcontract on the above mentioned construction project. According to the assignment contract, Drilling agreed to pay Jones the sum of $10,000.00 and all of taxpayers' income tax liability for the years 1948, 1949 and 1950 including interest, penalties and expenses incurred in the defense of such tax liability. The claim versus the United States arose in 1944 upon completion of the project. The claim was denied after repeated appeals and negotiations extending over a period of almost five years. Suit was then commenced in the U.S. Court of Claims on May 9, 1949, in the name of the prime contractor, Shepherd. Both Shepherd and Jones were interested in the prosecution of the claim.
 
 
 8
 The contract of assignment between Jones and Drilling is rather full and complete. It contains recitals to the effect that attorneys in Dallas, Texas, and Washington, D.C. had been employed on a contingency basis to prosecute the claim against the Government; that Jones had expended considerable time, effort and money in the prosecution of the claim and was desirous of shifting any further expense in connection therewith. Drilling agreed to sustain and pay for any further additional expense in connection with the claim. The contract was approved at a special meeting of the Board of Directors of Drilling. According to the minutes which were introduced in evidence, there was considerable discussion by the Directors as to the desirability of entering into the contract; the uncertainties involved in the claim versus the United States; and the tax liability asserted against the individual taxpayers for the years 1948, 1949 and 1950. The Directors further concluded that should a profit be realized from the transaction ultimately, the same was not to become available to pay dividends but was to be retained as working capital. The Secretary-Treasurer of Drilling was directed to pay Jones the $10,000.00 consideration provided in the contract; or if Jones so elected, to execute a note of the corporation payable to Jones for said sum to be dated February 3, 1953, payable on demand with interest at the rate of 5%. Although Jones was a majority stockholder, there were four members of the Board of Directors, Jones being one, and no family relationship between the members of the Board is indicated.
 
 
 9
 Finally, in July of 1953 the Court of Claims ruled on the suit which Shepherd had commenced against the United States in 1949. The Court ruled that Shepherd was entitled to 37% of the additional compensation he had claimed for the Cumberland Project. Shepherd v. United States, 113 F.Supp. 648, 125 Ct.Cl. 724. That decision became a final one on October 11, 1953; labeling $339,677.68 of the total recovery as relating to work performed by Jones. The necessary expenses and fees totaling $79,741.61 attributable to Jones were deducted and in April of 1954, a check for $259,936.07 was sent to Jones and he immediately endorsed and delivered it to Drilling pursuant to the assignment contract of the prior year.
 
 
 10
 Taxpayers filed a petition in the Tax Court in April 1953 to review the 1948, 1949 and 1950 deficiencies assessed against them, but at the time conceded that they were indebted for certain tax deficiencies and interest. At all times relevant to this case, no payment has been made on the tax deficiencies either by Jones or Drilling.
 
 
 11
 At the inception of his business, taxpayer kept his books and reported his income on the cash receipts and disbursement basis. There were no income tax returns filed by taxpayer for the years 1948, 1949 and 1950, but the tax due was determined on the cash basis. The Tax Court found taxpayer to be on the cash basis for those years.[5] In the instant case, the Tax Court found that in 1951 taxpayer's books reflected certain accounts receivable and payable, notes payable, and accrued payroll taxes. The amounts in connection with a certain Government project (Randall Field) were not accrued but later reported on a cash basis. Jones also kept his books and reported income on the cash basis for the years 1953 through 1958. Taxpayers never requested or received permission of the Commissioner as required by the applicable regulation to change his accounting method either in 1951 or in 1953.[6] The Tax Court ultimately found that taxpayers kept their books on the accrual basis in 1951.
 
 
 12
 The Commissioner determined deficiencies in income tax and additions to tax for substantial underestimation and failure to file declarations of estimated tax against taxpayers for the calendar years 1951 and 1953, and against Drilling for the period ending January 31, 1954, and the taxable year ending January 31, 1956. The decisions are dated July 29, 1960.
 
 
 13
 The Tax Court found that taxpayers had elected to change from the cash to the accrual method of reporting income in 1951 which change was impliedly consented to by the Commissioner. However, an amount which the Commissioner had determined to be due in 1951 was held not to accrue until 1952 and hence taxable in the latter year. Neither party seeks review of the latter holding.
 
 
 14
 The Tax Court next found that since taxpayers failed to obtain the Commissioner's express consent to leave the accrual method of reporting income pursuant to the claimed voluntary change by taxpayers to such method in 1951 plus implied consent of the Commissioner, they were required to accrue, in 1953, the amount of $259,936.07 realized from the judgment. It held that Jones' assignment to Drilling was an anticipatory assignment of income, and accordingly held the amount to be taxable as ordinary income to taxpayers, Jones, in 1953.
 
 
 15
 The amount of $259,936.07 was held not to be income to Drilling when the judgment in favor of Shepherd became final in 1953. Drilling at all times herein kept its books on the accrual basis. The Commissioner has asked this Court to review this holding in the event that income is held not to be taxable to Jones personally.
 
 
 16
 We come now to the matter of the assignment by Jones to Drilling. Was it an anticipatory assignment of income taxable as such to the assignor, Jones, and not taxable to the assignee, Drilling? The Tax Court ruled that the funds received were income to Jones and sustained the deficiency assessment asserted against Jones for the calendar year 1953. Although the money was not received until 1954, the judgment awarding it became final in 1953. Under the facts and in the circumstances of this case, we disagree with the conclusion reached by the Tax Court.
 
 
 17
 Cases of this kind are not easy to decide. In seeking to reconcile the implications of the infinite variety of facts presented by the decided cases and all that has been said about the subject of anticipatory assignment of income, one is likely to be displeased with his own wits; and may find his mind teetering between conflicting conclusions. As stated by Mr. Justice Stone in Harrison v. Schaffner, 312 U.S. 579, 61 S.Ct. 759, 85 L.Ed. 1055:
 
 
 18
 "Drawing the line' is a recurrent difficulty in those fields of the law where differences in degree produce ultimate differences in kind.'
 
 
 19
 Nevertheless, there are distinct and identifiable principles which have been developed in tax jurisprudence which serve to guide to courts.
 
 
 20
 The early landmark case is Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731, which laid down the principle that one who is entitled to receive at a future date, interest or compensation for services and who makes a gift of it by an anticipatory assignment, realizes taxable income quite as much as if he had collected it and then turned it over to the donee. In that case, Earl and his wife executed a contract in which they agreed that all property acquired by either, earned or otherwise, would be owned equally by them. Involved were the salary and attorney's fees earned by Earl, the husband. It was in that case that Mr. Justice Holmes laid down the rule that such cases are not to be decided by 'attenuated subtleties.' It was in that case also, that the distinguished Justice originated the often used tree-and-fruit metaphor by concluding his opinion with the following statement:
 
 
 21
 '* * * we think that no distinction can be taken according to the motives leading to the arrangement by which the fruits are attributed to a different tree from that on which they grew.'
 
 
 22
 In Burnet v. Leininger, 285 U.S. 136, 53 S.Ct. 345, 76 L.Ed. 665, a husband who was a member of a partnership assigned future income from the partnership business to his wife. The taxpayer contended that his wife was a member of the partnership. It was held that this result could not be achieved without the consent of the other partners, which had not been obtained. The assignee wife took no part in the management and contributed nothing to the partnership capital. There was no business purpose related to the assignment. The husband was taxed on all of the income notwithstanding the assignment.
 
 
 23
 The case of Blair v. C.I.R., 300 U.S. 5, 57 S.Ct. 330, 81 L.Ed. 465, presented a fact situation in which the donor, the beneficiary of a trust, assigned a share of the income from the trust to the donee for life, without retaining any form of control over the interest assigned. The court held that assignment constituted a transfer in presenti to the donee, of a life interest in the corpus of the trust property and therefore the income thereafter paid to the donee was taxable to him and not the donor. The contention of the Government, pointing to applicable provisions of the revenue acts then in force imposing upon the beneficiary, the donor, liability for the tax upon the income distributable to such beneficiary, was rejected by the court. The opinion reasoned that the terms used in the revenue acts were merely descriptive of the one entitled to the beneficiary's interest and therefore could not preclude a valid assignment. The assignment was from a father to his daughter. A different fact situation produced a different result in Harrison v. Schaffner, 312 U.S. 579, 61 S.Ct. 759, 85 L.Ed. 1055, when the beneficiary of a testamentary trust assigned to certain of her children specified amounts in dollars from the trust income to be paid following the year of the assignment. The trustee paid the income to the assignees pursuant to the assignment. The court ruled that such income was taxable to the assignor and not the assignees, rejecting the argument that the assignees became donees of an interest in the trust property for the term of one year. Taxation is a practical matter, said the court:
 
 
 24
 'Taxation is a practical matter and those practical considerations which support the treatment of the disposition of one's income by way of gift as a realization of the income to the donor are the same whether the income be from a trust or from shares of stock or bonds which he owns.'
 
 
 25
 Although both Blair and Schaffner involved the assignment of trust income, the court recognized the 'difference in degree.'[7] In Schaffner, emphasis was placed on the fact that the donor did not part with the property involved in any real sense:
 
 
 26
 'We think that the gift by a beneficiary of a trust of some part of the income derived from the trust property for the period of a day, a month or a year involves no such substantial disposition of the trust property as to camouflage the reality that he is enjoying the benefit of the income from the trust of which he continues to be the beneficiary, quite as much as he enjoys the benefits of interest or wages which he gives away as in the Horst and Eubank cases (infra).'
 
 
 27
 The cases of Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75, 131 A.L.R. 655; Helvering v. Eubank, 311 U.S. 122, 61 S.Ct. 149, 85 L.Ed. 81; and the Schaffner case were all decided at the same term of the Supreme Court and all three opinions were written by Mr. Justice Stone. The question in the Horst case was whether the gift during the doner's taxable year, of interest coupons detached from the bonds and delivered to the donee, the son of the donor, and later in the same taxable year paid to the donee, was realization of income taxable to the donor. The donor was held liable for the tax. The court emphasized the fact that ownership and control of the property remained in the donor:
 
 
 28
 'We have held without deviation that where the donor retains control of the trust property the income is taxable to him although paid to the donee.'
 
 
 29
 'Although the donor here, by the transfer of the coupons, has precluded any possibility of his collecting them himself, he has nevertheless, by his act, procured payment of the interest, as a valuable gift to a member of his family. Such a use of his economic gain, the right to receive income, to procure a satisfaction which can be obtained only by the expenditure of money or property, would seem to be the enjoyment of the income whether the satisfaction is the purchase of goods at the corner grocery, the payment of his debt there, or such nonmaterial satisfactions as may result from the payment of a campaign or community chest contribution, or a gift to his favorite son. Even though he never receives the money, he derives money's worth from the disposition of the coupons which he has used as money or money's worth in the procuring of a satisfaction which is procurable only by the expenditure of money or money's worth. The enjoyment of the economic benefit accruing to him by virtue of his acquisition of the coupons is realized as completely as it would have been if he had collected the interest in dollars and expended them for any of the purposes named.'
 
 
 30
 In the foregoing opinion, the court took notice of the following facts: The coupons were a gift; they were delivered to the donee during the taxable year; the control of the property which produced the income remained in the donor; the gift was made shortly before the due date of the coupons; and the coupons were a valuable gift to a member of the donor's family.
 
 
 31
 In some respects, the underlying facts in the Eubank case are similar to those in the Horst case. Eubank, a general life insurance agent, after termination of his agency contracts and services as agent, made assignments of renewal commissions to become payable to him for services rendered as agent. The opinion points out that there was no purpose of the assignments except to confer on the assignee the right to collect; that the commissions were paid during the taxable year of the assignments; and that the assignments were voluntary transfers. The transferor was taxed.
 
 
 32
 'No purpose of the assignments appears other than to confer on the assignees the power to collect the commissions, which they did in the taxable year. The Government and respondent have briefed and argued the case here on the assumption that the assignments were voluntary transfers to the assignees of the right to collect the commissions as and when they became payable, and the record affords no basis for any other.'
 
 
 33
 Timken v. C.I.R. (6 Cir., 1944), 141 F.2d 625, involved the assignment of a note including principal and accrued interest. At the time of assignment, the maker was in default and some feeling of uncertainty was justified as to whether collection could be made. The note was paid however, and the question arose as to whether the interest on the note should be taxed to the estate of the donor. The court held it was not, pointing to the fact that the donor made a full and complete transfer of the debt, principal and interest, and that the debt became the absolute property of the transferee.
 
 
 34
 Wellhouse v. Tomlinson, D.C.S.D.Fla.1961) 197 F.Supp. 739, is a well reasoned case containing a review of the authorities. Wellhouse assigned an unsecured promissory note owed by the estate of Welles on which there was due $4,200.00 principal and interest of $2,184.00. The assignment was made on October 22, 1953, and the note was paid to the assignee on February 2, 1954. The court concluded that the assignor, Wellhouse, was not taxable on the interest as contended by the Commissioner because there was considerable doubt as to the obligation of the maker to pay the note in the circumstances of the case; the assignment was not in the year of payment; and the assignor had fully and completely assigned the note, retaining no interest therein. Cf. Austin v. Commissioner, 6 Cir., 1947, 161 F.2d 666.
 
 
 35
 A corporate taxpayer assigned its claim to royalty income and other funds which had already been paid and deposited in the registry of the court subject to the outcome of pending litigation in the case of Cold Metal Process Co. v. C.I.R., (6 Cir., 1957) 247 F.2d 864. Accumulated funds from royalty payments, and settlement proceeds from litigated cases involving the validity of patents, some of which funds were paid prior and some subsequent to the date of assignment, were held taxable to the trustee (assignee) pursuant to the assignment and not to the corporate assignor.[8] Doyle v. C.I.R., (4 Cir., 1945) 147 F.2d 769, involved the assignment by the taxpayer to his wife and children of a percentage of a breach of contract claim which cost the assignor $928.75 and resulted in a payment of $34,926.01. Doyle had acquired a one-fourth interest in the claim by assignment from Friedeberg for the mentioned sum of $928.75. The Commissioner did not claim that Friedeberg who assigned to Doyle had received taxable income in excess of the $928.75, but did claim that Doyle was taxable on the proceeds notwithstanding an assignment to his wife and children of a portion of the proceeds. The court sustained the contention of the Commissioner, noting that Doyle had not transferred the entire claim, but transferred only three-fifths to his wife and sons, retaining two-fifths for himself. The opinion emphasizes the fact that the assignments to the wife and sons were made in December 1937 and January 1938, the judgment paid in March 1938, after the judgment proceeds were practically assured and the net amount to be realized therefrom reasonably ascertainable.
 
 
 36
 'At the time that taxpayer executed the deeds of gift to his wife and sons, the profit on his purchase of the interest in the law suit had already been rendered certain by the judgment of the Court of Claims and denial of certiorari by the Supreme Court. The effect of the deeds of gift, therefore, was to transfer interest in this certain profit as well as interests in the original investment upon which the profit was realized. We think that the profit had been realized with sufficient definiteness at the time of the transfer to require that it be treated as income of the taxpayer and not of the transferees.'
 
 
 37
 This Court had occasion to pass upon the problem of an alleged anticipatory assignment of income in Cotnam v. C.I.R., (5 Cir., 1959) 263 F.2d 119, 70 A.L.R.2d 1035. In 1940, Hunter promised to give Mrs. Cotnam one-fifth of his estate if she would serve him as an attendant or friend for the remainder of his life. She gave up her employment and her home, moved to Mobile, Alabama, and faithfully performed the duties requested until Hunter died 4 1/2 years later. Hunter left no will and a long, hard-fought lawsuit ensued between Mrs. Cotnam and Hunter's Administrator, resulting in a decision of the Alabama Supreme Court (Merchants Nat. Bank of Mobile v. Cotnam, 250 Ala. 316, 34 So.2d 122) upholding a judgment for Mrs. Cotnam in the amount of $120,000.00. This award was based on the alleged oral contract between Mrs. Cotnam and Hunter. Her attorneys' fees amounted to $50,365.83, she having in effect, assigned to her attorneys 40% of her claim in order to litigate and collect under the alleged contract which she asserted. The Commissioner permitted an apportionment of the judgment proceeds over the period of 4 1/2 years during which Mrs. Cotnam served Hunter in accordance with 107 of the Internal Revenue Code of 1939, 26 U.S.C.A. 107. The Commissioner allowed attorneys' fees as an expense for the year 1948 only, the year of payment, and the Tax Court upheld the Commissioner. Among others, this Court was called upon to pass upon the question, 'should the amount paid the attorneys from the judgment in favor of Mrs. Cotnam be excluded from the taxpayer's gross income, on the theory that it was not income to her?'. This Court held that the share of the proceeds received by Mrs. Cotnam was ordinary income to her, but that the sum assigned to her attorneys was not income to her. The amount received by Mrs. Cotnam was earned pursuant to a contract to render personal services. The Revenue Code of 1939 was involved. The court rejected the contention of the taxpayer that the amount of the award to her was by, 'gift, bequest, devise, or inheritance,' and thus should be excluded from gross income. In rejecting this contention, it was pointed out that the Alabama Supreme Court enforced a contract 'for her services'; that her pleadings in the Alabama proceedings 'was based on the theory of a contract for services'; and that her original claim filed in the Probate Court (essential to the life of her suit) alleged an agreement for personal services in the following language:
 
 
 38
 'Which agreement has been fully performed on her part, and for services rendered * * *.'
 
 The curt concluded:
 
 39
 'Here the amount of the judgment represented payment under a contract for personal services.'
 
 
 40
 Speaking of the nature of her claim, it was said:
 
 
 41
 'She could and did acquire it because her contract gave it to her for personal services rendered. Accordingly, the judgment in Mrs. Cotnam's favor was correctly taxed as income for personal service 'in whatever form paid'.'A majority of the Court speaking through Judges Rives and Brown concluded:
 
 
 42
 'Her claim had not fair market value, and it was doubtful and uncertain as to whether it had any value. The only economic benefit she could then derive from her claim was to use a part of it in helping her to collect that remainder. Accordingly she, in effect, assigned to her attorneys forty per cent of the claim in order that she might collect the remaining sixty per cent. That was not the assignment of income of Mrs. Cotnam within the doctrine of Lucas v. Earl, 1930, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731. Mrs. Cotnam's services had been performed before Mr. Hunter's death, and for those services she had earned a claim which was worthless without the aid of skillful attorneys. At the time that she entered into the contingent fee contract, she had realized no income from the claim, and the only use she could make of it was to transfer a part so that she might have some hope of ultimately enjoying the remainder.'
 
 
 43
 'Mrs. Cotnam's tree (Lucas v. Earl, supra) had borne no fruit and would have been barren if she had not transferred a part interest in that tree to her attorneys, who then rendered the services necessary to bring forth the fruit.'
 
 
 44
 The review herein undertaken of the authorities above cited is not intended to be complete or exhaustive in any sense. Many cases have dealt with the problem of anticipatory assignment of income. An analysis of the cases cited will however, we believe, adequately demonstrate the principles and facts which the courts on all levels have considered in reaching a legal, equitable and just conclusion. In the light of such principles and under the facts and circumstances of this case, we conclude that the proceeds of the judgment here under consideration are not taxable to Jones, and are taxable to Drilling. We believe it appropriate to point out that the claim prosecuted by Shepherd against the United States by means of which the funds were realized, was at the time of assignment on February 3, 1953, uncertain, doubtful and contingent. The contract of assignment between Jones and Drilling shows that the attorneys for Shepherd were employed on a contingency basis. For over four years after the completion of the project in 1944, this claim ran the full gamut of negotiations, discussions and repeated appeals without success. Finally, suit was filed on May 9, 1949, judgment rendered on July 13, 1953, over four years later, which judgment became final on October 11, 1953, but the proceeds of the judgment were not delivered until April 1954, approximately ten years after the claim arose. The opinion by Judge Whitaker, Shepherd v. U.S., 113 F.Supp. 648, 125 Ct.Cl. 724, is almost ten pages long. It would be naive indeed to assert that such a claim was not doubtful, uncertain and contingent in view of the facts. Indeed, lawsuits are rarely certain and free of doubt. Experienced lawyers have long since learned that it is unwise and indeed, ultra foolish to predict the results of litigation. Unlike assignments in some of the authorities herein reviewed, the assignment in this case was full, complete, final and definite. When this assignment was made over five months before the Court of Claims announced its decision, over nine months before the decision became final, and over fourteen months before payment was received, the 'tree' appeared to be blighted and almost devoid of life. It had borne 'no fruit' and to a layman such as Jones, while hopeful and confident because he believed in the justice of his claim, certainly he could not be said to have sufficient insight reasonably to speculate what the United States Court of Claims would ultimately decide. His confidence and hope could not have been supported, we dare say, by a written opinion of competent counsel experienced in the disappointments and uncertainties of modern day litigation.
 
 
 45
 No gratuity or gift is involved here as has been involved in numerous other cases. So far as the record discloses, the assignment contract was an arm's length transaction. Both parties apparently executed and acknowledged it after proper deliberation. We can find no evidence in the record to support the conclusion that Jones 'got his money's worth' as was held to be the case by some of the opinions involving gratuitous assignments by a father to a favorite minor son. Actually, the Commissioner did not make any serious contention that the assignment contract was not valid as between the parties; and as we understood counsel for the Commissioner on oral argument, its validity was not there contested. Whether contested or not, we hold the assignment to be valid.
 
 
 46
 The assignment was not made in the same taxable year in which the claim was paid. The Tax Court was clearly in error in its finding that the assignment was executed on September 3, 1953, which would have been subsequent to the judgment of the Court of Claims rendered on July 13, 1953.[9] This error is recognized by counsel for the Commissioner in its brief as being contrary to the stipulations of the parties.
 
 
 47
 We also believe that it may reasonably be said that the assignment in this case arose out of the legitimate exercise of reasonable business judgment and for a business purpose. Jones had terminated his business as sole proprietor and had sold substantial amounts of his equipment to two separate corporations. When the assignment was made, Jones had spent approximately nine long, expensive and weary years trying to collect his claim. He could not collect it when he needed it most. If he had, perhaps the story would have been different. The single fact that Rife foregave him a debt in excess of $265,000.00 is fairly convincing evidence that Jones was insolvent at the time. No relationship between the two or any circumstances calculated to give rise to unusual friendship or affection on the part of Rife for Jones are shown. The foregiveness of so large a debt is usually compelled by stark reality and foreboding clouds of economic adversity. The relinquishment of so large a debt without rhyme or reason bespeaks a benevolence rarely encountered in the marketplace. In addition to a fully justifiable inference of insolvency which is reasonably supported by the Rife debt forgiveness, Jones testified that he was insolvent before and after the forgiveness.
 
 
 48
 By the terms of the assignment, Jones had 'expended considerable time, effort and money in the prosecution' of the claim and was 'desirous of shifting any further expense in connection with the prosecution.' On the other hand, Drilling stated in the contract that it 'is willing to sustain and pay for any further and additional expense in connection with the prosecution of such claim.' In addition, Drilling agreed to pay Jones the sum of $10,000.00 and to pay any and all of the income tax obligations of the taxpayers, together with penalties and interest for each of the years 1948, 1949 and 1950, and to render 'whatever assistance, financial or otherwise, it may be able to render now or at any time in the future, in settling, disposing of or litigating such tax obligations.' Such provisions do not generate the thought that gratuities are involved or that no business purpose existed for the assignment.
 
 
 49
 We cannot held but comment in passing, although this fact in no wise controls our decision, that the same Government which now asserts that Jones should pay tax on the assigned funds, insinuating at least the connotation that the claim was valuable and certain, had vigorously opposed Jones for nearly ten years in another forum, where the Government contended that Jones (Shepherd) was not entitled to the amount received. Opposed to Jones every step of the way was the strong arm of the United States Government and also the possibility, as indicated by the record, of his legal inability to force Shepherd to pay him after recovery. The full and lengthy opinion in Shepherd v. U.S., supra, settled all of those contingencies, but until so settled they were real, vital and active. Further, it seems to us that the equities of the case, considered in its broadest connotation, are with Jones. We have not considered this case as an equitable one, but have undertaken to ground our decision on a legal basis. Certainly, all courts enjoy doing justice, and a happy result is achieved when equitable and legal considerations compel a joining of hands to reach the same result. As stated in the per curiam on petition for rehearing in the Doyle case:
 
 
 50
 'The 'equities' to which reference is made in the opinion have significance only to the extent that they show that the decision arrived at on the legal basis above indicated accords with what is reasonable and right in the premises.'
 
 
 51
 The complex and varied ways in which anticipatory assignment cases arise and the decisions which have been based upon such assignments, clearly show that no one fact is unusually decisive, but all of the facts, the circumstances and the complete background should be examined in each case to reach a proper determination on that issue.
 
 
 52
 We come now to a consideration of the holding by the Tax Court that the taxpayer voluntarily changed from the cash to the accrual method of accounting in the year 1951, although consent of the Commissioner was not applied for or obtained; and therefore, he must report on the accrual basis for the years involved subsequent to the alleged change in 1951. The Tax Court held that the Commissioner gave his implied consent to the change:
 
 
 53
 'Petitioner here has made a change in 1951 in his accounting method voluntarily and without consent of respondent. In making his determination respondent has sought to impose consistency upon petitioner under the accounting method of petitioner's choice, thereby accepting the change and implying consent.' (Tr. p. 158)
 
 
 54
 On the other hand, the Tax Court found that the taxpayers reported income in the year 1953 on the cash basis but held that since the taxpayers had not obtained the Commissioner's permission, they should not be permitted to change back to the cash basis:
 
 
 55
 'It is admitted that he never sought permission of respondent to change that method between 1951 and 1953. It is a regulatory requirement that taxpayers obtain respondent's permission prior to any change in accounting method. Thus, respondent may reject any change made without his consent, absent a showing that the method used prior to the unauthorized change distorted income. Advertisers Exchange, Inc., 25 T.C. 1086, affd. 240 F.2d 958. Consequently, respondent properly required petitioner to report his income in 1953 on an accrual basis.' (Tr. p. 160)
 
 
 56
 In this connection, a chronology of the taxpayer's numerous 'tax troubles' may be of interest. A substantial deficiency was asserted against the taxpayer for the years 1948, 1949 and 1950 and heavy penalties were assessed.[10] This was done in 1956. That decision was reviewed and opinion rendered by this Court on September 22, 1958.[11] It was determined by the Tax Court that the taxpayer kept his books on the cash basis for the years 1948, 1949 and 1950. Notice of Deficiency for the years 1951 and 1953 was issued by the Commissioner to the taxpayers on April 24, 1958, determining a deficiency in substantial amount. The statement accompanying the deficiency determined income tax liability for the years 1951, 1952, 1953 and 1954. The Commissioner determined that the taxpayers should have accrued the sum of $40,254.28 upon acceptance by the Government of certain work performed on the Fort Randall reservoir because the Commissioner held that taxpayers' books were kept on an accrual basis for the year 1951. The Commissioner likewise determined that taxpayers were required to report income in 1953 on an accrual basis. The determination for the years 1951, 1952, 1953 and 1954 were all included in one notice and statement. Exactly when the Commissioner gave his implied consent is not decided. When Jones was informed of such implied consent is not indicated. The income from the Fort Randall project was held to be cash income to Jones in 1952 by the Tax Court, although the facts were construed to show that on November 1, 1951, the Corps of Engineers had issued a letter of completion and acceptance of the work as of August 31, 1951, '* * * because the amount still due petitioner under the contract was subject to final audit by the Army Audit Agency.'
 
 
 57
 There is no dispute about the fact that during the existence of Jones' business, certainly from 1948 through 1954 inclusive and no doubt much earlier, his books were considered to have been kept on the cash basis with the exception of the disputed year, 1951. As a matter of fact, Jones always accrued some items on his books. It was generally the custom not to accrue sums due under hand, contracts. On the other hand, work done under private contracts were very often accrued with some variations depending upon the type of contract. Private contracts are usually definite and certain; whereas, Government contracts are often changed as to the amount of work to be performed; and all Government contracts require certain auditing, completion and approval procedure. The accountant who testified and who was recognized by the court as being thoroughly competent and trustworthy, testified as to the year 1951 that taxpayer's books might be described as 'a hybrid system'.
 
 
 58
 In the circumstances of this case we conclude that the only just and proper conclusion is to require reporting of income in 1951 on a cash basis, consistent with the other years involved. It does not seem appropriate to hold that the taxpayer is bound by the asserted conclusion that he changed from cash to accrual in 1951 without the express permission of the Commissioner and therefore he is bound by it under the theory of implied consent; while in the same decision holding that he must report in 1953 on the accrual basis because he had not followed the regulations requiring permission to change back to the cash basis. It does not appear that the permit the taxpayer to report on the cash basis for all the years involved (including 1951) would result in any substantial distortion of taxable income. The cash basis for all years would certainly achieve greater consistency. As the cases point out, the system used should be calculated to make certain that income and deductions are not shifted or grouped in such fashion as to cause a distorted result with unfair advantage to the taxpayer or the Government. As pointed out in the case of Patchen v. C.I.R., (5 Cir., 1958) 258 F.2d 544, the practice of giving the Commissioner an option may have serious consequences:
 
 
 59
 'The consequences of a choice either way cannot be forecast. They can be determined only after the event. What will the guide be for its exercise? The temptations, of course, would be present to adopt whichever course produces the greater revenue. That purpose the certainly not the philosophy which Congress reflects generally in the income tax law. For those taxpayers who read, and understand, and then religiously attempt to follow the Regulations forbidding a change in computation of the income tax return until consent is given, it also subjects them to the prospect to substantial penalties for underestimating the tax as well as to interest for a number of years on any such option-determined deficiencies. This latter would leave the taxpayer in the weird predicament of having the Commissioner determine that his tax was deficient because it ought to have been reported on a different basis even though, under the Regulations, the taxpayer had no legal right to prepare and file his return on the basis which would have avoided such liability.
 
 
 60
 'If any such option exists, we think it never could be exercised until all reasonable basis has been exhausted for accommodating the principal aims of conformity and consistency. After all, they have a common objective, to assure that income and deductions are not artificially and fortuitously bunched to produce a distorted picture with unrealistic and unfair advantage or disadvantage to taxpayer or the Government alike. Goodrich v. Commissioner, 8 Cir., 243 F.2d 686, 688. We nowhere near approach that situation here.'
 
 
 61
 Having decided that the contract between Jones and Drilling is valid and does not constitute an anticipatory assignment of income; that the taxpayers, Jones, are on a cash basis for all of the years under consideration; and there being no dispute of the fact that Drilling reports on an accrual basis, we come to a consideration of the nature of the income received by each of them pursuant to the assignment contract. We conclude such funds should be taxed as ordinary income to the taxpayers, Jones, and to Drilling. Needless to say, the individual taxpayers cannot escape liability for taxes owed by them even though Drilling has promised to pay such tax. They must pay whether or not Drilling pays pursuant to the contract of assignment. On the other hand, Drilling has assumed the obligation to pay '* * * any and all of the income tax obligations, together with all interest and penalties thereon, for each of the calendar years 1948, 1949 and 1950 of A. Raymond Jones and Mary Lou Jones * * *'.[12] We agree with the conclusion reached in Rhodes' Estate v. C.I.R., 131 F.2d 50, 6 Cir. 1942, and with Cotlow v. C.I.R., (2 Cir., 1955)228 F.2d 186, wherein it is stated:
 
 
 62
 'Where there is an arm's length assignment of income rights for a valuable consideration, it is clear that the assignor realizes only the amount of the consideration received, Rhodes v. Commissioner, 1941, 43 B.T.A. 780, affirmed 6 Cir., 1942, 131 F.2d 50, and the assignee is taxable for receipts in excess of this amount. See Blair v. Commissioner, 1937, 300 U.S. 5, 57 S.Ct. 330, 81 L.Ed. 465; G.C.M. 24849, 1946-1 Cum.Bull. 66, 67-68.'
 
 
 63
 Although Jones was not shown to occupy the status of an employee of Drilling as was the case in Old Colony Trust Company v. C.I.R., 279 U.S. 716, 49 S.Ct. 499, 73 L.Ed. 918, payment by Drilling of income taxes due and payable by Jones constitutes additional taxable income to Jones as held in Old Colony Trust Company. Jones cannot claim the benefit of the capital assets provision under 117[13] of the Internal Revenue Code of 1939, 26 U.S.C.A. 117. This transaction cannot qualify as a 'capital assets' transaction. C.I.R. v. P. G. Lake, Inc., 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743. All funds received by Jones and all funds received by Drilling pursuant to the assignment contract are ordinary income. Section 117 requires that there be a 'sale or exchange' of certain defined capital assets in order that such income may receive capital gains treatment. The funds received by Drilling in this case did not result from a 'sale or exchange'. Drilling has sole nothing. Cotlow v. C.I.R., supra.
 
 
 64
 Therefore, the net amount received by Drilling, $259,936.07, represents ordinary income to it and since Drilling kept its books and reported its income on the accrual basis, said amount must be accrued by Drilling at the time the judgment of the U.S. Court of Claims became final on October 11, 1953.
 
 
 65
 As to the $10,000.00 which Drilling agreed to pay Jones, the record is not entirely clear as to whether a demand note was executed and delivered. In our view, this detail makes no material difference. The contract of assignment, relied upon by Jones and by Drilling, states in Item 1 thereof, 'in consideration of the sum of $10,000.00 and other good and valuable considerations, receipt of which is hereby acknowledged * * *'. In addition to this fact, and more important, is the statement contained in the minutes of the special meeting of the Board of Directors as follows:
 
 
 66
 'The Secretary-Treasurer was directed to pay the $10,000.00 mentioned in the agreement to Mr. Jones, or if Mr. Jones so elected to execute a note of the Corporation, payable to Mr. Jones for the $10,000.00, to be dated February 3, 1953, and be payable on demand, with interest at 5%.'
 
 
 67
 It appears from the foregoing that if Jones did not receive the $10,000.00, he elected to take a note in lieu of receiving cash and therefore he should be taxed on this item as of the date of the contract of assignment, February 3, 1953. Jones should also be taxed on any sums paid on his income tax liability by Drilling in accordance with the obligation of the assignment as and when such payments are made. As heretofore stated, Jones is on the cash basis for the years under consideration and any payments made by Drilling to discharge his (and his wife's) tax liability pursuant to the agreement is unquestionably income to Jones as of the date of payment.
 
 
 68
 Drilling, on the other hand, is admitted to be on the accrual basis. Cost items incurred by Drilling pursuant to the terms of the contract of assignment are valid deductions. The liability and obligation of Drilling to pay the tax of Jones pursuant to the assignment contract should be accrued as and when the tax liability of Jones becomes final Dixie Pine Products Co. v. C.I.R., 320 U.S. 516, 64 S.Ct. 364, 88 L.Ed. 270:
 
 
 69
 'It has never been questioned that a taxpayer who accounts on the accrual basis may, and should, deduct from gross income a liability which really accrues in the taxable year. It has long been held that, in order truly to reflect the income of a given year, all the events must occur in that year which fix the amount and the fact of the taxpayer's liability for items of indebtedness deducted though not paid; and this cannot be the case where the liability is contingent and is contested by the taxpayer. Here the taxpayer was strenuously contesting liability in the courts and, at the same time, deducting the amount of the tax, on the theory that the state's exaction constituted a fixed and certain liability. This it could not do. It must, in the circumstances, await the event of the state court litigation and might claim a deduction only for the taxable year in which its liability for the tax was finally adjudicated.'
 
 
 70
 In this connection it seems appropriate to point out that according to the stipulation of the parties, incorporated in the findings of fact by the Tax Court, that on April 14, 1953, when the taxpayers filed petitions in the Tax Court seeking a redetermination of the deficiencies asserted against them for the years 1948, 1949 and 1950, they did not contest certain amounts of the deficiencies and conceded at that time that they were indebted for tax deficiencies and interest in the amount of $85,660.39. The stipulations of the parties, items 9 and 10, are as follows:
 
 
 71
 '9. On or about April 14, 1953, A. Raymond Jones and Mary Lou Jones filed petitions with the Tax Court of the United States seeking a redetermination of the deficiencies asserted against them for the years 1948, 1949 and 1950.'
 
 
 72
 '10. At the time such petitions were filed and, by reason of the fact that certain amounts of the proposed deficiencies were not contested therein, A. Raymond Jones and Mary Lou Jones conceded that they were indebted for tax deficiencies and interest in the amount of $85,660.39.'
 
 
 73
 It should be observed also that the petition of the taxpayers, Jones, was heard by the Tax Court which rendered its decision on June 29, 1956, redetermining the deficiencies of the taxpayers and that the taxpayers appealed to this Court[14] by petition for review filed on September 26, 1956, but they did not contest the amount of the tax deficiencies determined against them by the Tax Court or the interest due thereon for the years 1948, 1949 and 1950, and the same became final, except for penalties, on September 29, 1956, in the amount of $202,679.94. Items 11, 12, 13 and 14 from the Stipulation are as follows:
 
 
 74
 '11. Said cause having been heard by a division of the Tax Court of the United States sitting at Dallas, Texas, the Court made and entered its decision on June 29, 1956, redetermining the deficiencies against the said A. Raymond Jones and Mary Lou Jones as follows:
 
 
 75
 Income Additions to the tax under Section
Year Tax 291 (a) 293 (a) 294 (d) (1) (A) 294 (d) (2)
1948 $49,701.79 $12,425.45 $24,850.90 None $2,982.11
1949 80,173.88 20,043.47 40,086.94 $8,017.39 4,810.43
1950 14,164.78 3,541.20 None 1,416.48 849.89"
 
 
 76
 '12. On September 26, 1956, A. Raymond Jones and Mary Lou Jones filed a petition for review of the decision of the Tax Court of the United States with the United States Court of Appeals for the Fifth Circuit. Such appeal applied only to the penalties sought to be asserted against them as addition to the tax for the years 1948, 1949 and 1950. They did not contest the amount of the tax deficiencies determined against them by the Tax Court of the United States or the interest due thereon.'
 
 
 77
 '13. All items of the deficiency determined against A. Raymond Jones and Mary Lou Jones by the Tax Court with respect to the years 1948, 1949 and 1950, except for the penalties, became final on September 29, 1956.'
 
 
 78
 '14. On that day, it was finally determined that A. Raymond Jones, and Mary Lou Jones had tax liability for the years 1948, 1949 and 1950 in the amount of at least $202,679.94 including interest that that date.'
 
 
 79
 If Drilling never actually pays the tax pursuant to its unquestioned obligation to do so in accordance with the contract of assignment, proper adjustments may be made in accordance with the principles announced in Zimmerman Steel Co. v. C.I.R., (8 Cir., 1942) 130 F.2d 1011, 143 A.L.R. 1054, and in accordance with the principles set forth in Perry v. United States, (1958) 160 F.Supp. 270, 142 Ct.Cl. 7.
 
 
 80
 For the reasons set forth above herein, the case of A. Raymond Jones and Mary Lou Jones v. C.I.R., Tax Court Docket 75149 is Reversed. It follows that the case of C.I.R. v. Drilling Accessory & Manufacturing Company, Inc., Tax Court Docket 75196 must also be Reversed in view of our holding that the individual taxpayers, Jones, are held not to be taxable on the net proceeds of the Court of Claims judgment and that Drilling is taxable on the net proceeds thereof. Both of said cases are Remanded for further proceedings in consonance with this opinion.
 
 
 81
 Reversed and remanded.
 
 
 
 [1]
 Pursuant to order of this Court entered November 3, 1960
 
 
 [2]
 The wife is a party for the sole reason that joint returns were filed
 
 
 [3]
 Tax Docket No. 75149
 
 
 [4]
 Tax Docket No. 75196
 
 
 [5]
 Jones v. C.I.R., (5 Cir., 1958) 259 F.2d 300, Jones, 25 T.C. 1100
 
 
 [6]
 Reg. 111, 29.41-2 Bases of computation and changes in accounting methods. * * *
 '(c) A taxpayer who changes the method of accounting employed in keeping his books shall, before computing his income upon such new method for purposes of taxation, secure the consent of the Commissioner. For the purposes of this section, a change in the method of accounting employed in keeping books means any change in the accounting treatment of items of income or deductions, such as a change from cash receipts and disbursements method to the accrual method, or vice versa; * * * Application for permission to change the method of accounting employed and the basis upon which the return is made shall be filed within 90 days after the beginning of the taxable year to be covered by the return. The application shall be accompanied by a statement specifying the classes of items differently treated under the two methods and specifying all amounts which would be duplicated or entirely omitted as a result of the proposed change. Permission to change the method of accounting will not be granted unless the taxpayer and the Commissioner agree to the terms and conditions under which the change will be effected.'
 
 
 [7]
 See quotation from Harrison v. Schaffner, page 296, supra
 
 
 [8]
 The following excerpts are from the opinion:
 '* * * the legal right to the income was being strenuously contested by the Government and there was no certainty at the time of the transfer that the transferor's right thereto would ever be established or that the money would ever be paid to either the transferor or transferee. The amount that might eventually be collected was unliquidated. Having previously held that by reason of the uncertainty of Cold Metal ever being able to collect on any of its claims for infringement, such claims did not constitute accrued income to it in 1945 and that Cold Metal was not taxable on it in 1945, we have real difficulty in now ruling that under the same circumstances and same uncertainties Cold Metal had nevertheless 'earned' such income on December, 29, 1945. The facts which prevented it from being accrued income in 1945 also prevented it from being 'earned' income at that time in the usually accepted meaning of the term. 'Earn' is defined in Webster's New International Dictionary, Second Edition, as: '1. To merit or deserve, as by labor or service; to do that which entitles one to (a reward, whether the reward is received or not); * * * 2. To acquire by labor, service or performance; * * *.' If the decision in the Cancellation suit had gone against Cold Metal in 1948, it would not have required the income or at any time been entitled to it. We do not think it can rightfully be classified as having been earned in 1945.'
 'Regardless of the terminology used with respect to the income, its taxability depends upon the actual circumstances existing at the time of the transfer. At that time, it was not income to Cold Metal. It was an unliquidated chose in action. Cold Metal divested itself of all title, interest and control over it at that time. Later developments over which Cold Metal had no control transformed it into taxable income which was paid to and received by the new owner for its sole use and benefit. These facts fall far short of classifying the transaction as an anticipatory assignment of income taxable to the assignor when later paid. In Harrison v. Schaffner, supra, 312 U.S. 579, at pages 580 and 582, 61 S.Ct. 759, (85 L.Ed. 1055), the Supreme Court stated that the rule applicable to an anticipatory assignment of income applies when the assignor is entitled at the time of the assignment to receive the income at a future date and is vested with such a right. Cold Metals's right was not a vested right in 1945. We think that the absolute and unconditional assignment by it in 1945 of the income producing property together with a contingent right to income therefrom, payable, if at all, at some indefinite time in the future in an indeterminate amount, with respect to which the assignor had no voice or control whatsoever, prevents us from treating the case as one involving the anticipatory assignment of income, which when paid becomes taxable to the assignor. This conclusion is in accord with our previous ruling in Commissioner of Internal Revenue v. Timken, 6 Cir., 141 F.2d 625, 629. Compare: Anthony's Estate v. Commissioner, 10 Cir., 155 F.2d 980, 983, and Austin v. Commissioner, 6 Cir., 161 F.2d 666, 668, certiorari denied 332 U.S. 767, 68 S.Ct. 75, (76) 92 L.Ed. 352, where the distinction is made between income actually earned at the time of the assignment and income the payment of which is continuant. * * *'
 
 
 [9]
 'On September 3, 1953, petitioner and Drilling executed a document entitled 'Agreement and Assignment of Interest' concerning petitioner's claim against Shepherd. Under the terms of this document petitioner purported to convey to Drilling all his rights, title, and interest to his claim against the United States of America and Drilling agreed to pay petitioner $10,000 and to pay any and all income tax obligations, together with interest and additions thereto, of Raymond and Mary Lou for the years 1948, 1949 and 1950. Raymond and Mary Lou filed a petition with the Tax Court contesting the deficiencies determined by the Commissioner for the years 1948, 1949 and 1950, in April 1953.' (Tr., pgs. 153-4)
 
 
 [10]
 A. Raymond Jones, 25 T.C. 1100
 
 
 [11]
 Jones v. C.I.R., (5 Cir., 1958) 259 F.2d 300
 
 
 [12]
 See Item 2, Page 3, Exhibit 5E which is the Assignment Contract
 
 
 [13]
 Section 117(a)(1) provides in relevant part: 'The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property hold by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in (the) trade or business, of a character which is subject to the allowance for depreciation provided in section 23(l), or real property used in (the) trade or business of the taxpayer.' 53 Stat. 50, as amended, 56 Stat. 846
 Section 117(a)(4) provides: 'The term 'long-term capital gain' means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing net income.' 53 Stat. 51, as amended, 56 Stat. 843.
 Section 117(b) provides: 'In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net capital gain, net capital loss, and net income:
 '100 per centum if the capital asset has been held for not more than 6 months;
 '50 per centum if the capital asset has been held for more than 6 months.' 56 Stat. 843.
 
 
 [14]
 Jones v. C.I.R., 259 F.2d 300 (5 Cir.)