REVISED, July 21, 2000

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

_____

m 99-60437

_____

SUDHIR P. SRIVASTAVA AND ELIZABETH S. PASCUAL,

Petitioners-Appellants,

VERSUS

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee.

_____

Appeal from the United States Tax Court
_____
July 19, 2000

Before POLITZ, SMITH, and DENNIS,
   Circuit Judges.

JERRY E. SMITH, Circuit Judge:

   This challenge to a notice of deficiency requires us to determine whether the portion of a judgment or settlement payable to a taxpayer's attorney pursuant to a contingent fee agreement governed by Texas law constitutes gross income under § 61 of the Internal Revenue Code, 26 U.S.C. § 61. Following *Cotnam v. Commissioner*, 263 F.2d 119 (5th Cir. 1959), which excluded from gross income contingent fees governed by Alabama law, we conclude that contingent fees paid according to Texas law are also excludable.

   We therefore reverse the Tax Court's contrary conclusion and remand for a recalculation of the deficiency and a new determination of the propriety and size of any penalties. We find no clear error in the Tax Court's allocation of the litigation settlement between non-taxable items (that is, actual damages) and taxable items (that is, interest and punitive damages) and thus affirm on that issue.

## I.

Petitioner Sudhir Srivastava, like his wife, petitioner Elizabeth S. Pascual, is a medical doctor. The KENS-TV television station aired a series of investigative reports accusing Srivastava of delivering poor quality medical care and committing acts that would have been criminal under Texas law. These reports destroyed Srivastava's practice and caused substantial financial and emotional harm to him and his family.

Srivastava sued the station and its parent corporations (collectively, the "station") in state court for defamation and related claims. The jury awarded $11.5 million in actual damages, $17.5 million in punitive damages, and pre- and post-judgment interest. The station appealed, then it and its insurance carriers settled for $8.5 million.

The station was covered by a number of policies that were triggered at different tiers of liability. Two of the insurers were insolvent, however, and thus afforded no protection. The station's first $2 million of liability was covered by Continental Casualty and American Casualty. Liability between $2 million and $7 million was supposed to be covered by Mission Insurance Company, but it was insolvent. Likewise, the insurer for liability between $7 and $12 million, Western Employer's Casualty, was functionally insolvent. Columbia Casualty Company and Hudson Insurance Company covered liability for the $12 million to $22 million range, and Federal Insurance Company insured the station for liability in excess of $22 million. The station thus was ineffectively covered for liability in the $2 to $7 million range, so, to activate the higher levels of coverage in the absence of a negotiated settlement, it would be forced to take responsibility for that liability range.

The parties reached a partial settlement agreement, releasing the station from liability in exchange for $8.5 million, to be paid by the station and some of the insurers. The agreement was structured to discharge divers portions of the judgment separately, in accordance with the stations' various tiers of coverage. The first $7 million of the award was jointly discharged by Continental Casualty, contributing $2.1 million, and the station, contributing $1 million. The station additionally would discharge the $7 million to $12 million portion of the judgment, and the award of post-judgment interest, by paying $2.4 million. Columbia Casualty and Hudson Insurance agreed to pay $3 million to settle the $12 million to $22 million portion of the judgment. Any remaining amounts would be pursued against Federal Insurance Company exclusively.[1]

## II.
### A.

Petitioners received their settlement proceeds in 1991 but reported no gross income therefrom, reasoning that the judgment constituted recovery exclusively for non-taxable actual damages.[2] To recover the tax on the portion of the settlement representing (according to the Commissioner's

---

[1] Federal Insurance Company, the station's insurer for liabilities in excess of $22 million, denied coverage on the ground that the station had not suffered liability in excess of $22 million. This court upheld that decision. *See Federal Ins. Co. v. Srivastava*, 2 F.3d 98 (5th Cir. 1993).

[2] For the law governing the taxable years in question, *see* 26 U.S.C. § 104(a)(2) (West 1988) (excluding from gross income the "amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness").

determinations) interest and punitive damages, both of which are taxable,[3] the Commissioner of Internal Revenue issued a notice of deficiency of $1,188,920 for tax year 1991 and $33,037 for tax year 1992.[4]

The settlement agreement did not separate the proceeds into the various categories of recovery for (non-taxable) actual damages and (taxable) interest and punitive damages, nor did the parties discuss any method of allocation. The Commissioner thus estimated the amounts attributable to interest and punitive damages by applying to the settlement agreement the proportions of the original jury verdict represented by interest and punitive damages. The Commissioner also assessed penalties of $237,784 for 1991 and $6,607 for 1992.

### B.

The petitioners challenged the deficiency notice in the Tax Court, which rejected their argument that the portion of the settlement payable to their attorneys under the contingent fee agreement did not constitute gross income. The Tax Court also rejected their claim that the settlement award represented exclusively actual damages.

Rather than examining the settlement award in its entirety, and then dividing it among actual damages, interest, and punitive damages, based on the proportions found in the original jury verdict (as the Commissioner had done), the Tax Court first broke the settlement down by the various tiers established by the settlement agreement, then matched each tier to its corresponding portion of the jury award. That is, the portion of the settlement discharging the first $11.5 million, which the jury had awarded for actual damages, was attributed to actual damages. In other words, the amounts paid by Continental Casualty and the station were left untaxed.

The Tax Court attributed the balance of the station's payment to interest, a taxable item. The payments from Columbia Casualty and Hudson Insurance Company, representing the remaining interest and punitive damages, was made subject to tax.

The Tax Court reduced the deficiencies and penalties accordingly. It disallowed the assessment of penalties with respect to the amount of deficiency attributable to punitive damages, holding that the petitioners, though wrong in doing so, had reasonable cause for not reporting taxable income arising from the portion of the settlement representing punitive damages.[5] The Tax Court left intact the penalties with respect to interest.

### III.

The petitioners contend that the portion of a judgment or litigation settlement payable to their attorney pursuant to a contingent fee

---

[3] *See* 26 U.S.C. § 61(a)(4) (including interest within gross income); *O'Gilvie v. United States*, 519 U.S. 79 (1996) (holding that punitive damages are not awarded "on account of personal injuries or sickness" pursuant to 26 U.S.C. § 104(a)(2) and therefore constitute gross income).

[4] The 1992 deficiency represents the elimination of a net operating loss carryover attributable to the settlement proceeds received in 1991.

[5] It was not until *O'Gilvie* that the Court made plain that punitive damages were not excludable under 26 U.S.C. § 104(a)(2) and therefore were subject to tax. *See Robinson v. Commissioner*, 102 T.C. 116 (1994) (holding that punitive damages are excludable from gross income under 26 U.S.C. § 104(a)(2)); *Threlkeld v. Commissioner*, 87 T.C. 1294 (1986) (same); *Roemer v. Commissioner*, 716 F.2d 693 (9th Cir. 1983) (same).

agreement governed by Texas law is not gross income. This is a question of substantial importance, for although attorney fee expenses, if included within gross income, may be deductible,[6] various limitations may operate to reduce the effectiveness of such deductions.[7]

---

[6] Attorney's fees are potentially deductible either as an "ordinary and necessary expense[] paid or incurred . . . in carrying on any trade or business," 26 U.S.C. § 162(a), or as an "ordinary and necessary expense[] paid or incurred . . . for the production or collection of income," 26 U.S.C. § 212(1). Determining which deduction to apply requires the use of the "origin of the claim" test. *See United States v. Gilmore*, 372 U.S. 39, 49 (1963) (observing that "the origin and character of the claim with respect to which an expense was incurred . . . is the controlling basic test of whether the expense was 'business' or 'personal' and hence whether [and how] it is deductible"). Because we conclude that Srivastava's contingent fees are excludable from gross income, we have no occasion to decide which basis for a deduction would have applied.

[7] For example, "the miscellaneous itemized deductions for any taxable year shall be allowed only to the extent that the aggregate of such deductions exceeds 2 percent of adjusted gross income." 26 U.S.C. § 67(a). Section 68 of the Internal Revenue Code limits the total amount of itemized deductions allowed. *See* 26 U.S.C. § 68. Finally, the alternative minimum tax also may operate to reduce the value of a deduction. *See* 26 U.S.C. §§ 55(b)(2), 56(b)(1)(A)(i). *See also Barlow-Davis v. Commissioner*, 210 F.3d 1346, 1347 n.3 (11th Cir. 2000) ("The deduction for attorneys' fees and costs which the IRS allowed was less favorable to the taxpayer than the exclusion-from-income approach adopted by the Tax Court because of the operation of technical tax rules such as the alternative minimum tax."); *Kenseth v. Commissioner*, 2000 U.S. Tax Ct. LEXIS 32, at *18, 114 T.C. No. 26 (2000) ("This controversy is driven by the substantial difference
(continued...)

Were we ruling on a *tabula rasa*, we might be inclined to include contingent fees in gross income. Principles of tax neutrality, if nothing else, dictate that result, for when a taxpayer recovers from a favorable judgment or litigation settlement, and compensates his attorney on a *non-contingent* basis, the full amount of the recovery may be treated as gross income (as petitioners acknowledged during oral argument). There is no apparent reason to treat *contingent* fees differently or to believe that Congress intended to subsidize contingent fee agreements in such a fashion.

In *Cotnam*, however, this court excluded contingent fees governed by Alabama law from the client's gross income. Because *Cotnam* is substantially indistinguishable from this case, we reverse the Tax Court and decide that contingent fees governed by Texas law are also excludable. In doing so, we acknowledge the circuit split on this issue, with the Sixth Circuit recently adopting *Cotnam*'s reasoning,[8] and the Third,[9] Ninth,[10] and Federal[11] Circuits

---

(...continued)
in the amount of tax burden that may result from the parties' approaches. The difference, of course, is a consequence of the plain language of sections 56, 67, and 68, so the characterization of the attorney's fees as excludable or deductible becomes critical."). (Footnote omitted.)

[8] *See Estate of Clarks v. United States*, 202 F.3d 854, 857 (6th Cir. 2000) ("We follow *Cotnam* concluding that the majority in *Cotnam* correctly distinguished *Lucas v. Earl*").

[9] *See O'Brien v. Commissioner*, 38 T.C. 707, 712 (1962), *aff'd,* 319 F.2d 532 (3rd Cir. 1963) (holding that contingent attorney fees are "gross income to [taxpayer] under the familiar principles of *Lucas v. Earl*").

[10] *See Coady v. Commissioner*, 213 F.3d 1187, ____, 2000 U.S. App. LEXIS 13692, at *10 (9th
(continued...)

including contingent fees in gross income.[12] We also acknowledge the Tax Court's objection to *Cotnam*[13] and note that, as it properly has observed, in cases ultimately appealable to this court,[14] the Tax Court is bound by our precedent.[15]

A.

Because the text of the Internal Revenue Code is of little help,[16] we turn to judicially-developed tax law principles, one of which is that any income or gain is not taxed until it is "realized."[17] In addition, to combat "anticipatory arrangements" designed to keep income from ever being realized by one person by the device of vesting, in advance of realization, the rights to such income in another, the Supreme Court has developed the doctrine of anticipatory assignments of income:[18]

> In the ordinary case the taxpayer who acquires the right to receive income is taxed when he receives it, regardless of the time when his right to receive payment accrued. But the rule that income is not taxable until realized has never been taken to mean that the taxpayer, . . . who has fully enjoyed the benefit of the economic gain represented by his right to receive income, can escape taxation because he has not himself received payment of it from his

---

(...continued)
Cir. June 14, 2000) ("We are persuaded by . . . Judge Wisdom's dissent in *Cotnam*."); *Brewer v. Commissioner*, 172 F.3d 875, 1999 U.S. App. LEXIS 3568, at *2 (9th Cir. 1999), *aff'g without published opinion* T.C. Memo. 1997-542 ("The fact that [the taxpayer] did not actually receive the gross payment and that the legal fees were paid directly to counsel does not alter the fact that Brewer received the benefit of the full settlement amount.").

[11] *See Baylin v. United States*, 43 F.3d 1451, 1454-55 (Fed. Cir. 1995) (including contingent fees in gross income).

[12] The Eleventh Circuit is bound by holdings of the former Fifth Circuit. *See Davis,* 210 F.3d at 1347 n.2.

[13] *See Kenseth*, 2000 U.S. Tax Ct. LEXIS 32, at *21 ("The *Cotnam* holding with respect to the Alabama attorney lien statutes has been distinguished by this Court from cases interpreting the statutes of numerous other states. Significantly, this Court has, for nearly 40 years, not followed *Cotnam* . . . .") (collecting cases).

[14] *See* 26 U.S.C. § 7482(a),(b).

[15] *See Golsen v. Commissioner*, 54 T.C. 742, 756-57 (1970), *aff'd*, 445 F.2d 985 (10th Cir.) (noting that "better judicial administration requires us to follow a Court of Appeals decision which is squarely in point where appeal from our decision lies to that Court of Appeals and to that court alone."); *Kenseth*, 2000 U.S. Tax Ct. LEXIS 32, at *29 ("With the exception of situations where . . . we feel compelled to follow the holding of a Court of Appeals, we have consistently held that at-
(continued...)

---

(...continued)
torney's fees are not subtracted from taxpayers' gross income to arrive at adjusted gross income.").

[16] *See* 26 U.S.C. § 61 (stating that "gross income means all income from whatever source derived"); *James v. United States*, 366 U.S. 213, 219 (1961) (noting "intention of Congress to tax all gains except those specifically exempted," and defining gross income broadly to include all gains from which, "when its recipient has such control over it . . ., as a practical matter, he derives readily realizable economic value") (citations and quotations omitted).

[17] *Helvering v. Horst*, 311 U.S. 112, 116 (1940) (noting "the rule that income is not taxable until realized ").

[18] *Lucas v. Earl*, 281 U.S. 111, 115 (1930).

obligor. The rule [of realization], founded on administrative convenience, is only one of postponement of the tax to the final event of enjoyment of the income, usually the receipt of it by the taxpayer, and not one of exemption from taxation where the enjoyment is consummated by some event other than the taxpayer's personal receipt of money or property. This may occur when he has made such use or disposition of his power to receive or control the income as to procure in its place other satisfactions which are of economic worth. . . .

[Under the anticipatory assignment of income doctrine,] income is 'realized' by the assignor because he, who owns or controls the source of the income, also controls the disposition of that which he could have received himself and diverts the payment from himself to others as the means of procuring the satisfaction of his wants. The taxpayer has equally enjoyed the fruits of his labor or investment and obtained the satisfaction of his desires whether he collects and uses the income to procure those satisfactions, or whether he disposes of his right to collect it as the means of procuring them.

*Horst*, 311 U.S. at 115-17 (citations omitted). The doctrine does not allow a taxpayer to evade tax through an "arrangement by which the fruits are attributed to a different tree from that on which they grew." *Earl*, 281 U.S. at 115.

In other words, what is taxed is not exclusively the receipt of funds, but rather any enjoyment of gain, whether monetary or non-monetary. For example, in the landmark *Earl* case, the taxpayer had contracted with his wife for her to receive half of any of his future income. The Court concluded that such an arrangement constituted an anticipatory assignment of income and attributed all of the income to the husband. *Id.* at 113-15.

Similarly, in *Horst*, the taxpayer, a holder of a coupon bond, had made a gift of interest coupons while retaining title to the bond. The Court again held that such an arrangement constituted an anticipatory assignment of income. *See Horst*, 311 U.S. at 119-20. In both cases, the taxpayer kept control of the asset or income source and merely committed future income streams to another. Such arrangements cannot be used to evade tax.

On the other hand, the doctrine does not apply to a taxpayer who transfers, sells, or otherwise relinquishes an asset or income source to another, because the taxpayer ceases to receive any income from that asset (excepting, of course, any gain realized from the sale). After all, a taxpayer no longer enjoys the fruits of a tree he no longer owns, just as a taxpayer does not receive income from "[t]he rent from a lease or a crop raised on a farm after the leasehold or the farm had been given away." *Id.* at 119 (citing *Blair v. Commissioner*, 300 U.S. 5, 12-13 (1937)). Thus, where a stockholder had assigned to a corporation his entire interest in a claim of uncertain value against the government, this court held that the anticipatory assignment of income doctrine did not apply, because the stockholder had fully divested himself of the claim and thus no longer received any income from that asset. *See Jones v. Commissioner*, 306 F.3d 292 (5th Cir. 1962).

B.

The question, therefore, is one of characterization, and, as we have recognized, is not always easy to apply in particular

6

cases.[19]  There are, to be sure, "distinct and identifiable principles which have been developed in tax jurisprudence which serve to guide . . . courts." *Id.* at 296.  As we shall see, however, contingent fee contracts defy easy categorization, standing as they do somewhere in between the two polesSSon the one hand, an obvious scheme to evade taxation through diversion of future income streams to another, and on the other hand, full and complete divestment of an income source.

### 1.

The most widely-applied principle for implementing the anticipatory assignment of income doctrine is that a taxpayer who makes an assignment of future income streams but retains ownership and control over the source of those funds has effected an anticipatory assignment of income.[20]  The principle rests on the sound inference that a taxpayer who

retains control over the tree, while handing out its fruits, is in fact continuing to enjoy the benefits of both.  By contrast, a taxpayer who has divested all dominion and control over a tree cannot be said to enjoy gain from its subsequent fruits.

Application of the taxpayer-dominion-and-control principle to the case of contingent attorney's fees yields no obvious answer, however.  We need not explore the entire realm of attorney-client relations or articulate all of their respective rights, duties, and obligations to recognize that, when a client hires an attorney to prosecute a claim on his behalf, control over that claimSSthe income source or "tree"SSis neither fully divested to the attorney nor fully retained by the taxpayer-client.  Rather, the claim is subject to a sort of virtual co-ownershipSS"[l]ike an interest in a partnership agreement or joint venture." *Clarks*, 202 F.3d at 857.[21]

To put it another way, contingent fee arrangements, to be sure, assign a percentage of the proceeds of any judgment or settlement agreementSSthe "fruit" of the treeSSto the attorney, thereby avoiding realization by the client of that portion of income.  But attorney retainer agreements accompanied by contingent fee provisions assign *more* than just the fruitSSand yet divest clients of something less than the entire tree.  Contingent fees are thus in a sense

> more like a division of property than an assignment of income.  Here the client as assignor has transferred some of the trees in his orchard, not merely the fruit

---

[19] *See Jones*, 306 F.2d at 296 (stating that anticipatory assignment of income cases "are not easy to decide.  In seeking to reconcile the implications of the infinite variety of facts presented by the decided cases and all that has been said about the subject of anticipatory assignment of income, one is likely to be displeased with his own wits; and may find his mind teetering between conflicting conclusions. . . . 'Drawing the line' is a recurrent difficulty in those fields of the law where differences in degree produce ultimate differences in kind.").

[20] *See Horst*, 311 U.S. at 119 ("We have held without deviation that where the donor retains control of the trust property the income is taxable to him although paid to the donee."); *Commissioner v. First Sec. Bank*, 405 U.S. 394, 403 (1972) ("In cases dealing with the concept of income, it has been assumed that the person to whom the income was attributed could have received it.  The underlying assumption always has been that in order to be taxed for income, a taxpayer must have complete dominion over it.").

[21] *But see Kenseth*, 2000 U.S. Tax Ct. LEXIS 32, at *31 ("Attorneys represent the interests of clients in a fiduciary capacity.  It is difficult, in theory or fact, to convert that relationship into a joint venture or partnership.").

from the trees. The lawyer has become a tenant in common of the orchard owner and must cultivate and care for and harvest the fruit of the entire tract.

*Id.* at 857-58.

The control test thus leaves us in a quandary. In light of this ambiguity, a number of other factors might be considered.

2.

It might be urged, for example, that, unlike the assignees in *Earl* and *Horst*, an attorney must perform to reap the benefits of the contingent fee agreement.[22] Certainly, a client contemplates that an attorney will work to earn his contingent share of any award. Indeed, the Sixth Circuit has so noted:

Here the lawyer's income is the result of his own personal skill and judgment, not the skill or largess of a family member who wants to split his income to avoid taxation. The income should be charged to the one who earned it and received it, not as under the government's theory of the case, to one who neither received it nor earned it.

*Id.*

Similarly, some courts have noted that *Earl* and *Horst* involved gratuitous transfers.[23] A

---

[22] *See Clarks*, 202 F.3d at 857 (distinguishing *Earl* and *Horst* on the ground that "[t]he assignee [in those cases] performed no services in order to receive the income").

[23] *See Jones*, 306 F.2d at 302 ("No gratuity or gift is involved here as has been involved in numerous other cases. So far as the record dis- (continued...)

contingent fee agreement, by contrast, is an arm's-length commercial transaction; we are hard-pressed to imagine a client who would offer his attorney a pure gratuity.

The anticipatory assignment of income doctrine does not recognize such distinctions, however, for the purpose of the doctrine is simply to capture the taxpayer who diverts a stream of income to achieve gain in non-monetary form and to prevent him from evading taxation through such an arrangement.

"[I]ncome is 'realized' by the assignor because he, who owns or controls the source of the income, also controls the disposition of that which he could have received himself and diverts the payment from himself to others as the means of procuring the satisfaction of his wants. The taxpayer has equally enjoyed the fruits of his labor or investment and obtained the satisfaction of his desires whether he collects and uses the income to procure those satisfactions, or whether he disposes of his right to collect it as the means of procuring them."

*Horst*, 311 U.S. at 117.

It therefore may be true that gratuitous transfers are particularly good opportunities for a taxpayer to enjoy his fruits in advance of realization by, for example, giving them away to loved ones, as in *Earl*, involving a transfer between spouses. There is nothing about arm's-length transactions that need preclude anticipatory assignments in that context, however. To the contrary, a taxpayer who anticipatorily assigns future streams of income to obtain services in return has quite obviously

---

(...continued)

closes, the assignment contract was an arm's length transaction.").

8

procured a benefit.[24]

Thus, where a medical partnership arranged for its patient group to fund a separate retirement trust for the benefit of the partnership's physicians, without ever vesting those funds in the partnership, the Supreme Court applied the anticipatory assignment of income doctrine and required the partnership to pay tax on the funds deposited into the retirement trust. *See United States v. Basye*, 410 U.S. 441, 448-53 (1973). That the payment was made at arm's length, rather than as a gratuity, was of no significance.

3.

Nor, as some courts have suggested, does uncertainty as to the valueSSindeed, not even uncertainty as to the *fact*SSof a contingent fee preclude application of the anticipatory assignment doctrine.[25] There is no questioning the fact that the value of a claim is often uncertain and difficult to predict.[26] But just

because a future income stream (or "harvest," if you will) is of uncertain value does not mean a taxpayer cannot achieve gain from anticipatorily assigning it to another. The taxpayer in *Earl*, after all, was taxed on the portion of his future salary anticipatorily assigned to his spouse; that there was some degree of inherent uncertainty in his future income stream went without comment and did not preclude application of the doctrine. *See Earl*, 281 U.S. at 113-15.[27]

4.

The main reason for a client to sign a

---

(...continued)
are rarely certain and free of doubt. Experienced lawyers have long since learned that it is unwise and indeed, ultra foolish to predict the results of litigation. . . . When this assignment was made over five months before the Court of Claims announced its decision, over nine months before the decision became final, and over fourteen months before payment was received, the 'tree' appeared to be blighted and almost devoid of life. It had borne 'no fruit' and to a layman . . ., while hopeful and confident because he believed in the justice of his claim, certainly he could not be said to have sufficient insight reasonably to speculate what the United States Court of Claims would ultimately decide."); *Cotnam*, 263 F.2d at 125 (Rives and Brown, JJ., concurring) (noting that taxpayer who merely had a claim to pursue in court was "a long way from having the equivalent of cash. Her claim had no fair market value, and it was doubtful and uncertain as to whether it had any value.").

[27] *See also Baylin,* 43 F.3d at 1455 (noting that the "temporarily uncertain magnitude of the legal fees under such an arrangement and the vehicle of an assignment cannot dictate the income tax treatment of those fees."); *Kenseth*, 2000 U.S. Tax Ct. LEXIS 32, at *30-*31 ("Despite characterizing petitioner's right to recovery as speculative, his cause of action had value in the very beginning; otherwise, it is unlikely that [his attorneys] would have agreed to represent petitioner on a contingent basis.").

---

[24] *See Kenseth*, 2000 U.S. Tax Ct. LEXIS 32, at *26 n.4 ("[T]he transfer of trees in and of itself could be consideration in kind and result in gains to the taxpayer. More significantly, if the trees are analogous to the taxpayer's chose in action or compensatory rights, then the transfer represents a classic anticipatory assignment of income.").

[25] *See First Sec. Bank*, 405 U.S. at 403-04 (noting that "the assignment-of-income doctrine assumes that the income would have been received by the taxpayer had he not arranged for it to be paid to another"); *Jones*, 306 F.2d at 301 ("We believe it appropriate to point out that the claim . . . was at the time of assignment . . . uncertain, doubtful and contingent."); *Clarks*, 202 F.3d at 857 (noting that, in *Earl* and *Horst*, "the income assigned to the assignee was already earned, vested, and relatively certain").

[26] *See Jones*, 306 F.2d at 301 ("Indeed, lawsuits
(continued...)

contingent fee contract, presumably, is not to avoid taxation by anticipatorily assigning future streams of income to others in exchange for non-monetary benefits. More likely, he signs it to secure the services of an attorney without having to put any capital at risk, and to encourage the attorney to perform well by offering a personal stake in the claim.

A taxpayer who enters into the contract recognizes that, to realize and maximize the value of his claim, he must necessarily obtain the resources and expertise of counsel.[28] But of course, the same is true of a client who retains counsel on a non-contingent fee basis. The fact that a contingent fee arrangement has the added benefits of risk-shifting and realignment of incentives does not alter the economic reality. Such an arrangement diverts a portion of the litigation proceeds from the client to the attorney, thereby accruing to the client non-monetary gain from enjoying the assistance of counsel without otherwise having to pay for

it.[29] That gainSSno less than the non-monetary gains recognized as income in *Earl*, *Horst*, and their progenySSis not to be excluded from gross income solely on the basis that the money is diverted to, and realized by, the taxpayer's assignee.

That is to say, if there were no contingent fee arrangement, Srivastava presumably would have had to compensate counsel out of his own pocket, rather than rely wholly on the income stream arising from his claim. He ought not receive preferential tax treatment from the simple fortuity that he hired counsel on a contingent basis,[30] for his attorney's method of compensation did not meaningfully affect the gain he was able to enjoy from a favorable resolution of the litigation.

### C.

Thus, were we to decide this case as an original matter, we might apply the anticipatory assignment doctrine to hold that contingent fees are gross income to the client. We do not, however, decide this case on a

---

[28] *See Cotnam*, 263 F.2d at 125-26 (Rives and Brown, JJ., concurring) ("The only economic benefit she could then derive from her claim was to use a part of it in helping her to collect the remainder. . . . [Her] claim . . . was worthless without the aid of skillful attorneys. At the time that she entered into the contingent fee contract, she had realized no income from the claim, and the only use she could make of it was to transfer a part so that she might have some hope of ultimately enjoying the remainder. . . . [S]he could never have collected anything or have enjoyed any economic benefit unless she had employed attorneys . . . ."); *Clarks*, 202 F.3d at 857 ("[T]he value of taxpayer's lawsuit was entirely speculative and dependent on the services of counsel. The claim simply amounted to an intangible, contingent expectancy. The only economic benefit Clarks could derive from his claim against the defendant in state court was to use the contingent part of it to help him collect the remainder.").

[29] *See Old Colony Trust Co. v. Commissioner*, 279 U.S. 716, 729 (1929) ("The discharge by a third person of an obligation to him is equivalent to receipt by the person taxed."); *Baylin*, 43 F.3d at 1545 (reasoning that "although the partnership did not take actual possession of the funds it paid to its attorney, opting instead to pay him directly out of its eventual recovery, it is evident that the partnership received the benefit of those funds in that the funds served to discharge the obligation of the partnership owing to the attorney as a result of the attorney's efforts to increase the settlement amount").

[30] *See Kenseth*, 2000 U.S. Tax Ct. LEXIS 32, at *26 (observing that "taxable recoveries in lawsuits are gross income in their entirety to the party-client and . . . associated legal feesSScontingent or otherwiseSSare to be treated as deductions") (footnote omitted).

clean slate, but must follow the contrary approach endorsed in *Cotnam*.

*Cotnam* dealt with a contingent fee agreement governed by Alabama law. A majority of that panel held that contingent attorney's fees are not subject to tax under the anticipatory assignment of income doctrine. The majority reasoned that, before judgment or settlement, a claim is of uncertain value, and that the lawyer's services are necessary to convert that claim into value to the taxpayer. *See Cotnam*, 263 F.2d at 125-26 (Rives and Brown, JJ., concurring).[31] Applying the familiar tree/fruit metaphor of *Earl*, the majority explained that "Mrs. Cotnam's tree had borne no fruit and would have been barren if she had not transferred a part interest in that tree to her attorneys, who then rendered the services necessary to bring forth the fruit." *Id.* at 126 (Rives and Brown, JJ., concurring).

The Commissioner invites us to distinguish *Cotnam* on the ground that we are faced with contingent fees governed by the law of Texas, not Alabama. The distinction rests on the predicate that Alabama gives its contingent fee

attorneys a greater degree of power to enforce their rights than does Texas.[32]

These distinctions, however, should not affect the analysis required by the anticipatory assignment of income doctrine, which looks to the taxpayer's degree of control and dominion over the asset. As we have said, a taxpayer who enters into a contingent fee contract divests some measure of control over a claim but retains the rest, and how much control is sufficient to trigger taxation under the anticipatory assignment of income doctrine is not easily answerable. But we find no assistance from the fact that Alabama may offer its contingent fee attorneys, by way of example, greater power to pursue relief directly against the *opposing party*. Whatever are the attorney's rights against the *defendant* under Texas law as opposed to Alabama law, the discrepancy does not meaningfully affect the economic reality facing the *taxpayer-plaintiff*.[33]

─────────────────────

[32] *Compare* ALA. CODE § 34-3-61 *with Dow Chem. Co. v. Benton*, 357 S.W.2d 565 (Tex. 1962).

[33] The dissent would distinguish *Cotnam* by limiting it to those contingent fee arrangements in whichSSas Alabama law providesSSan attorney can pursue a claim against the opposing party on his own, apart from the client's decision to pursue that claim. *See* ALA. CODE § 34-3-61(b) (stating that "attorneys-at-law shall have the same right and power over action or judgment to enforce their liens as their clients had or may have for the amount due thereon to them"). By contrast, the dissent would include, within gross income, contingent fees governed by Texas law, for, under Texas law, as the dissent correctly notes, "even when the attorney has been assigned an ownership interest in his client's cause of action, his rights remain wholly derivative from those of his client," and "the client's action is indivisible and may not be tried for only a per-

(continued...)

─────────────────────

[31] The additional language offered by Judges Rives and Brown offers the best insight into the majority's reasoning. Technically, it is Judge Wisdom's opinion that speaks for the court. As he expressly notes in his majority opinion, however, Judge Wisdom speaks not for himself, but only for Judges Rives and Brown, in excluding contingent attorney's fees from gross income. *See Cotnam*, 263 F.2d at 125 ("A majority of the Court, Judges Rives and Brown, hold that [attorney's fees] should not be included in [the taxpayer's] gross income."). *See also id.* at 126-27 (Wisdom, J., dissenting). We therefore take little guidance from Judge Wisdom's majority opinion, which speaks narrowly to the attorney's rights under Alabama law governing contingent fees and offers only cursory analysis to support the ultimate judgment.

centage of the cause of action." *See also Dow*, 357 S.W.2d at 567-68.

That this distinction is without a difference for purposes of the anticipatory assignment of income doctrine, however, is made clear simply by comparing the laws governing contingent fee arrangements in Alabama and Texas to the Supreme Court's two landmark decisions establishing the doctrine. In *Horst*, the taxpayer, "the owner of negotiable bonds, [had] detached from them negotiable interest coupons shortly before their due date and delivered them as a gift to his son who in the same year collected them at maturity." *See Horst*, 311 U.S. at 114. That arrangement is similar to the severable contingent fee agreement provided under Alabama law and at issue in *Cotnam*; like the Alabama contingent fee lawyer, the holder of the negotiable interest coupon in *Horst* needs no further action from the holder of the underlying negotiable bond to recover on the coupon.

By contrast, in *Earl* (decided ten years before *Horst*), the taxpayer had merely contracted away half of his future salary to his wife. *See Earl*, 281 U.S. at 113-14. Like the Texas contingent fee lawyer, Earl's wife could not enjoy the benefits of the agreement absent the continued efforts of her spouse.

The *Earl* CourtSSlike the instant dissentSSreasoned that such an arrangement was not enough to allow the taxpayer to exclude income. In *Horst*, the Court noted that the court below had "thought that as the consideration for the coupons had passed to the obligor, the donor had, by the gift, parted with all control over them and their payment, and for that reason the case was distinguishable from *Lucas v. Earl*." *Horst*, 311 U.S. at 114-15. But the Court rejected that argument, ultimately finding the two cases indistinguishable.

Similarly, *Cotnam* is indistinguishable from the instant case, and thus however the anticipatory assignment of income doctrine applies in one case, principles of consistency dictate that the doctrine

(continued...)

We therefore agree with the Tax Court that, irrespective of whether it is proper to tax contingent attorney's fees under the anticipatory assignment doctrine, the answer does not depend on the intricacies of an attorney's bundle of rights against the opposing party under the law of the governing state.[34] In refusing the Commissioner's request to distinguish *Cotnam* (as the Tax Court has grudgingly done on occasion[35]), we note that what the Commissioner truly seeks is

apply similarly in the other. Rightly or wrongly, this court in *Cotnam* decided not to apply the anticipatory assignment of income doctrine to contingent fee agreements. What the Commissioner and the dissent urge, in effect, is that we use whatever means necessary to avoid *Cotnam*. The Tax Court has already rejected that approach, and we do so as well.

[34] *See O'Brien*, 38 T.C. at 712 ("In reaching that conclusion the majority [in *Cotnam*] placed considerable stress upon certain provisions of an Alabama statute relating to attorneys' liens. . . . However, we think it doubtful that the Internal Revenue Code was intended to turn upon such refinements. For, even if the taxpayer had made an irrevocable assignment of a portion of his future recovery to his attorney to such an extent that he never thereafter became entitled thereto even for a split second, it would still be gross income to him under the familiar principles of [*Earl* and *Horst*].") ; *Kenseth*, 2000 U.S. Tax Ct. LEXIS 32, at *29 (rejecting distinction, quoting *O'Brien*, and "declin[ing] to decide this case based on the possible effect of various States' attorney's lien statutes") (footnote omitted).

[35] *See Kenseth*, 2000 U.S. Tax Ct. LEXIS 32, at *21 ("The *Cotnam* holding with respect to the Alabama attorney lien statutes has been distinguished by this Court from cases interpreting the statutes of numerous other states. Significantly, this Court has, for nearly 40 years, not followed *Cotnam* . . . .") (collecting cases).

a direct challenge to *Cotnam*, in the Eleventh Circuit[36] as well as here. We decline that invitation and, instead, reverse the Tax Court's decision to include contingent fees within gross income and remand for a recalculation of the deficiency.

## IV.

The petitioners challenge the Tax Court's decision to attribute portions of the settlement agreement to recovery for actual damages (which are not taxable) and other portions to interest and punitive damages (which are taxable). They contend that the entire settlement represents actual damages.

We determine the tax treatment of judgments and settlements by asking "in lieu of what was the judgment or litigation settlement awarded?" *Knuckles v. Commissioner*, 349 F.3d 610 (10th Cir. 1965).[37] We review the allocations made by the Tax Court only for clear error. *See id.* at 612. Finding none, we affirm that portion of the decision.

The petitioners urge that the settlement ought to represent actual damages exclusively, because the settlement award is identical to the amount their complaint had sought for actual damages. Not only is this factually untrue (in that petitioners prayed for actual damages "in an amount *in excess* of $8,500,000.00"), but it is also not the only plausible explanation, even if we were to restrict our analysis to the pleadings in the underlying state court litigation. We cannot be certain that, in settling the dispute, the parties restricted their attention to

actual damages and ignored the petitioners' claim for $2,000,000 or more in punitive damages, or their claim for interest.

To the contrary, although it did not state any method of allocation, the tiered settlement agreement demonstrated that the station's insurers were in fact focused on the portions of the verdict awarding interest and punitive damages. The jury awarded the petitioners actual damages of $11.5 million, an amount *below* the level of liability triggering coverage under the Columbia Casualty Company and Hudson Insurance Company policies (that is, below the $12 million to $22 million range). That those two insurers agreed to pay $3 million to settle the litigation strongly suggestsSSindeed, conclusively indicatesSSthat interest and punitive damages played some role in settlement negotiations.

Nor does this approach in any way undercut the petitioners' assertion that punitive damages were the most vulnerable to reduction, or even outright elimination, on appeal. Based on the Tax Court's methodology, of the $11.5 million awarded by the jury for actual damages, combined with additional sums for interest, Srivastava received $6 million. By contrast, though the jury awarded $17.5 million in punitive damages, the settlement agreement provided only $3 million.

The petitioners also assert that, in settling the dispute, they were motivated solely by concerns regarding the solvency of the various insurers. It is, however, the payor's intent, rather than the payee's, that carries the most weight.[38] Moreover, this assertion is undercut

---

[36] *See Davis*, 210 F.3d at 1347 n.4; *Kenseth*, 2000 U.S. Tax Ct. LEXIS 32, at *29 n.6.

[37] *See also Raytheon Prod. Corp. v. Commissioner*, 144 F.2d 110, 113 (1st Cir. 1944) (same).

[38] *See Knuckles*, 349 F.2d at 613 ("The most important fact in making that determination, in the absence of an express personal injury settlement

(continued...)

by the petitioners' claim that they also were concerned about their prospects for upholding the verdictSSparticularly the punitive damages portionSSon appeal.[39]

Even if petitioners were exclusively motivated by collection concerns, that merely addresses the need for some kind of negotiated settlement with the station and its solvent insurers. Such concerns do not implicate, in any way, the allocation of that settlement among actual damages, interest, and punitive damages; indeed, the petitioners' own brief at times unwittingly concedes as much. Their stated motives do not raise the level of doubt about the Tax Court's allocation methodology necessary to trigger reversal for clear error.

The Tax Court correctly concluded that some portion of the settlement was attributable to something other than actual damages. Of course, some arbitrariness is inevitable when segregating a litigation settlement into different categories of recovery in specific amounts. But the petitioners argue only that the Tax Court ought to have allocated the entire settlement to actual damages. They fail utterly to show that the court's judgment to the contrary, and the allocation methodology the court subsequently adopts, constitute clear error. We therefore affirm the Tax Court's decision with regard to interest and punitive damages.

## V.

Regarding the assessment of penalties, the

---

(...continued)
agreement, is the intent of the payor as to the purpose in making the payment.").

[39] In their initial brief on appeal, the petitioners claim that collectability was their exclusive concern. But in their reply brief, they admit that they also had concerns about sustaining the jury award of punitive damages in the state appellate court.

Internal Revenue Code provides that "there shall be added to the tax an amount equal to 20 percent of the portion of . . . any underpayment which is attributable to 1 or more of the following: . . . (2) Any substantial understatement of income tax." 26 U.S.C. § 6662(a), (b). An understatement is "substantial" if it is both more than "(i) 10 percent of the tax required to be shown on the return for the taxable year" and more than "(ii) $5,000." 26 U.S.C. § 6662(d)(1)(A). "No penalty shall be imposed . . . with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." 26 U.S.C. § 6664(c)(1).[40]

Our reversal of the Tax Court's decision to include contingent fees in gross income naturally gives the petitioners reasonable cause for failing to pay tax on that portion of the settlement, and the Commissioner does not challenge the Tax Court's refusal to penalize the petitioners for their failure to pay tax on the punitive damages portion.[41] Therefore, the only portion of the deficiency vulnerable to penalty is that portion of the settlement award representing interest (after contingent fees are excluded).

We must remand to the Tax Court to determine whether interest (excluding contingent fees) is alone sufficient to constitute a substantial understatement of taxSSthat is, whether the understatement is both more than "(i) 10 percent of the tax required to be shown on the return for the taxable year" and more than "(ii) $5,000." 26 U.S.C. § 6662(d)(1)(A). If the Tax Court determines that the underpayment attributable

---

[40] See also Treas. Reg. § 1.6664-4.

[41] See note 5, supra.

to interest alone is "substantial" under the statutory definition, the penalty should be assessed, because there was no reasonable cause for failure to pay tax on that portion of the settlement.

For reasons already discussed, the petitioners erred in failing to pay that tax. They argue, however, that they should not be penalized for that failure because they reasonably relied on the advice of professionals. Reviewing the Tax Court's rejection of the petitioners' argument only for clear error,[42] we affirm.

> Under the governing Treasury Regulations,
>
> [r]eliance on an information return or on the advice of a professional tax advisor or an appraiser does not necessarily demonstrate reasonable cause and good faith. . . . Reliance on an information return, professional advice, or other facts, however, constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith.

Treas. Reg. § 1.6664-4(b)(1). "[R]eliance may not be reasonable or in good faith if the taxpayer knew, or should have known, that the advisor lacked knowledge in the relevant aspects of Federal tax law." Treas. Reg. § 1.6664-4(c)(1).

The petitioners seek refuge in the professional advice of their attorney in the state court defamation litigation and their certified public accountant. It was not reasonable to rely on either, however.

Petitioners' attorney in the state court defamation claim testified not only that he is not a tax lawyer, but that he advised his client to seek out a tax lawyer for tax advice. Also, petitioners do not dispute that they never gave their accountant a copy of the settlement agreement, an obviously important factual disclosure that precludes a finding of reasonable reliance, because reliance is *per se* unreasonable "if the taxpayer fails to disclose a fact that it knows, or should know, to be relevant to the proper tax treatment of an item." Treas. Reg. § 1.6664-4(c)(1)(i).

There was no one both sufficiently qualified and adequately knowledgeable about the case on whom petitioners reasonably could have relied. Consequently, the Tax Court did not clearly err in finding that petitioners lacked reasonable cause to support their substantial underpayment. Therefore, if the Tax Court on remand determines that the failure to pay tax on interest alone (excluding contingent fees) constitutes a substantial underpayment under the statutory definition, the Commissioner may recalculate and assess a new penalty.

## VI.

In summary, we REVERSE the Tax Court's decision to tax contingent fees and REMAND for a recalculation of the deficiency and any appropriate penalties. We AFFIRM the Tax Court's allocation of the settlement proceeds among actual damages, interest, and punitive damages.ENDRECORD

---

[42] *See* Treas. Reg. § 1.6664-4(b)(1) ("The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances."); *Streber v. Commissioner,* 138 F.3d 216, 219 (5th Cir. 1998) ("This court reviews the tax court's findings of negligence under the clearly erroneous rule. Clear error exists when this court is left with the definite and firm conviction that a mistake has been made.") (citations omitted).

DENNIS, Circuit Judge, concurring in part and dissenting in part:

I respectfully dissent from the majority opinion's reversal of the Tax Court's decision to tax the clients on their attorney's fees paid out of recovery of punitive damages and interest thereon. I concur in the balance of the majority's decision, however, for the reasons stated in its opinion.

In my opinion, Cotnam v. Commissioner, 263 F.2d 119 (5th Cir. 1959), based in part on Alabama law, is distinguishable and not controlling in the present case based in part on Texas law. In Cotnam a majority of this court's panel held that the amount of a contingent fee paid out of a taxpayer's recovery in a breach of contract action was not income to the taxpayer. The sum was held to be income to the attorneys but not to Mrs. Cotnam, the taxpayer, for the following reasons:

> The Alabama Code provides: 'The attorneys at law shall have the same right and power over said suits, judgments and decrees, to enforce their liens, as their clients had or may have for the amount due thereon to them'. In construing this statute the Alabama courts have given full effect to the statute. Attorneys have the same rights as their clients. Western Railway Co. v. Foshee, 1913, 183 Ala. 182, 62 So. 500; Denson v. Alabama Fuel & Iron Co., 1916, 198 Ala. 383, 73 So. 525. Under Alabama law, therefore, Mrs. Cotnam could never have received the $50,365.83, even if she had settled the case directly with the Bank.
>
> In United States Fidelity & Guarranty Co. v. Levy, 5 Cir., 1935, 77 F.2d 972, 975, Judge Hutcheson, speaking for the Court, held that the Alabama statute creates a charge 'in the nature of an equitable assignment . . . (or) equitable lien' in the cause of action. An attorney 'holding such an interest has an equity in the cause of action and the recovery under it prior to that of the defendant in the judgment to exercise a right of set-off accruing to him after the attorney's interest had attached.'
>
> The facts in this unusual case, taken with the Alabama statute, put the taxpayer in a position where she did not realize income as to her attorneys' interests of 40% in her cause of action and judgment.

Id. at 124 (footnote quoting 46 Code of Alabama § 64 (1940) omitted).

Under Texas law attorneys do not have the same right and power as their clients in the clients'

causes of action, suits, judgments or decrees, to enforce attorney's liens, interests or contingency fee claims against the defendants. In <u>Dow Chemical Company v. Benton</u>, 357 S.W.2d 565, 567-68 (1962), the Texas Supreme Court held that an attorney may not prosecute a cause of action on his own behalf to secure a contingent fee after his client, the original plaintiff, has been properly dismissed from the case for refusal to appear for deposition. The contingent fee contract involved there was virtually identical to the one in the present case.[43] The client had agreed to "sell, transfer, assign and convey to my said attorneys the respective undivided interests in and to my said claim . . . and to any judgment or judgments that I may obtain or that may be rendered to me or my heirs and assigns." <u>Id</u>. at 566. The Texas Supreme Court explained:

> [T]he lawyer's rights, based on the contingent fee contract, are wholly derivative from those of his client. The attorney-client relationship is one of principal and agent. <u>Texas Employers Ins. Ass'n v. Wermske, Tex.</u>, 349 S.W.2d 90 (1961). Therefore, the rights of each in a cause of action during the existence of that relationship are necessarily dependent upon and inseparably interwoven with the other. Neither lawyer nor client should be permitted to select the good features of his contract and reject the bad. There is but one cause of action. Our decisions uphold an agreement to assign a part of the recovery on the cause of action to the attorney. But we have never held that the cause of action is divisible and may be tried for only a percentage

---

[43] In the present case, in addition to providing for payment of expenses, the contingent fee agreement between the taxpayers and their attorneys provided in relevant part:

> I/We, the undersigned, hereinafter called CLIENTS, employ the law firm of BRANTON & HALL, P.C., hereinafter called ATTORNEYS, understanding that the legal services rendered and to be rendered will be by ATTORNEYS of the professional corporation at its discretion. CLIENTS hereby sell, convey, and assign to BRANTON & HALL, P.C., as consideration for said services a forty percent (40%) interest in and to any and all causes of action, claims, demands, judgment, or recoveries which CLIENTS may hold or receive because of damages and injuries received and sustained by DR. SUDHIR SRIVASTAVA and DR. ELIZABETH PASCUAL as a result of the television broadcasts on Channel 5 in February, 1985.

17

of the cause of action.

. . . .

. . . [A]s long as the attorney-client relationship endures, with its corresponding legal effect of principal and agent, the acts of one must necessarily bind the other as a general rule.

. . . .

We do not reject the rationale that a properly worded contingent fee contract may effect an assignment of part of the recovery and a part of a cause of action to the attorney. However, the attorney who has received such an assignment invariably elects to litigate his interest simultaneously with his client's interest, in his client's name, and elects implicitly to be bound by any judgment properly rendered in the case. We hold that so long as the existing agency relationship is not terminated, as by the opposite party's buying out the client's interest, the attorney must be bound by that election.

Id. at 567-68.

Consequently, under Texas law, unlike that of Alabama, an attorney is not granted by statute the same right and power as his client over his client's cause of action and judgment for the independent enforcement of his attorney's fee claim. Under Texas law, even when the attorney has been assigned an ownership interest in his client's cause of action, his rights remain wholly derivative from those of his client; the attorney-client relationship remains one of principal and agent; the rights of the lawyer and the client are inseparable, interdependent and interwoven; the client's action is indivisible and may not be tried for only a percentage of the cause of action. As long as the attorney-client relationship endures, the acts of one must necessarily bind the other as a general rule. The attorney who has received an assignment of a part of his client's cause of action is deemed by law to have elected to litigate his interest simultaneously with his client's interest, in his client's name, and to be bound by any judgment properly rendered in the case. So long as the attorney-client relationship is

18

not terminated by the client's actions purporting to settle the case with the opposite party litigant, the attorney is bound by that election.

For these reasons and others assigned by the Tax Court or acknowledged in the majority's candid opinion, I conclude that the taxpayers in the present case did not by virtue of their attorney-client contract divest themselves of part of their interests in the claim, or vest a legal, independently enforceable ownership interest in that claim in their attorneys. Accordingly, the taxpayers received as income the portions of the settlement consisting of punitive damages and interest that were earmarked for the payment of their attorney's fees, and I believe that the taxpayers must pay taxes on those proceeds.[44] "[T]he taxpayer, even on the cash receipts basis, who has fully enjoyed the benefit of the economic gain represented by his right to receive income, can[not] escape taxation because he has not himself received payment of it from his obligor. . . . [Taxation] may occur when he has made such use or disposition of his power to receive or control the income as to procure in its place other satisfactions which are of economic worth." Helvering v. Horst, 311 U.S. 112, 116 (1940).

---

[44]In response to footnote 33 of the majority opinion, out of an abundance of caution, it should be noted that this case involves only the question of whether a client may avoid payment of income taxes on his recovery of Texas noncompensatory punitive damages which this court held not excluded from the client's gross income by I.R.C. § 104(a)(2). See Estate of Moore v. Commissioner, 53 F.3d 712 (5th Cir. 1995). This case does not affect § 104(a)(2)'s exclusion from gross income of a client's recovery of compensatory damages for personal injuries or sickness or the exclusions from gross income of punitive damages by I.R.C. § 104(c)(1996).