# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 19, 2009

Charles R. Fulbruge III
Clerk

No. 08-10006

In the Matter of: CHAMA LAND and CATTLE COMPANY

Debtor

--------------------------------------------------

UNITED STATES OF AMERICA, on behalf of Internal Revenue Service

Appellee

v.

WALTER O'CHESKEY

Appellant

---

Appeal from the United States District Court
for the Northern District of Texas

---

Before SMITH, BARKSDALE, and PRADO, Circuit Judges.

PER CURIAM:[*]

This case involves the complex interplay of bankruptcy and tax law and includes a procedural posture spanning over ten years and six courts. We conclude that the distributions in question were a return of equity, not a payment of damages, that the bankruptcy court did not exceed the scope of the

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

district court's remand, and that the Trustee may not yet take a tax deduction for unpaid New Mexico taxes. We therefore affirm in part, reverse in part, and remand for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A.    Factual Background

Grady Vaughn ("Grady") was an oil and gas and real estate investor in Dallas, Texas. Through an inheritance, he and his younger brother, Gary Vaughn ("Gary"), owned all of the shares of Chama Land & Cattle Company ("Chama"). Chama's assets included a 32,000-acre ranch in New Mexico (the "Ranch"), a hunting lodge, two Class A game park licenses, and a large herd of elk. As of the late 1980s, Gary was the trust beneficiary of approximately $8.9 million of assets that Grady managed as co-trustee. Gary's assets included 31.2% of Chama's stock. Grady owned the remaining 68.8% of Chama's stock.

In November 1988, Grady signed four promissory notes in favor of NCNB Texas National Bank ("NCNB") with an aggregate principal amount in excess of $24.3 million. To secure these notes, Grady pledged, inter alia, his 68.8% share of Chama's stock. In November 1991, NCNB transferred its interest in the promissory notes and collateral to the FDIC, which in turn sold its interest in these notes and collateral to Regency Savings Bank ("Regency") for $14.5 million. Thus, Grady was in debt to Regency for over $20 million. Gary did not have any debts.

In early 1989, federal and state authorities began investigating allegedly illegal wildlife trapping at the Ranch. To address these problems, as well as his other financial issues, Grady enlisted the assistance of Legal Econometrics, Inc. ("LEI") and its principal, Malcolm Kelso ("Kelso"), who was a "crisis manager." Instead of assisting, however, Kelso allegedly undertook several fraudulent actions that, although purportedly to protect Chama's assets from the state of New Mexico and Grady's creditors, actually gave Kelso control of the Ranch and

diluted the value of Regency's security interest in the Chama stock. These transactions (the "1990 Transactions") resulted in Kelso's taking the helm of Chama and led to the effective transfer of most of Chama's assets to three other debtors (the "Chama Estates"). Kelso also allegedly drained Gary's trust fund of approximately $8.9 million and misused Chama's assets to fund the 1990 Transactions and pay for the resulting litigation. During the confirmation hearing for the Trustee's Chapter 11 Plan that resulted from Kelso's fraudulent actions, the bankruptcy court described the 1990 Transactions as follows:

> The separateness of the [Chama] Estates, if any, resulted from contrived transactions, ostensibly for the benefit of Grady Vaughn and the ranch itself in dealing with state authorities in New Mexico who were seeking criminal and civil penalties. In fact, the transactions giving rise to the [Chama] Estates were a means by which Kelso improperly gained control of the [Chama] Estate corporations or their assets for his own benefit and in breach of his fiduciary duty.

The bottom line is that Kelso's 1990 transactions diluted the value of NCNB's security interest in Grady's 68.8% of the Chama stock and also diluted the value of Gary's interest. As discussed above, Regency eventually bought NCNB's diluted security interest.

In May 1991, Gary sued Grady, Kelso, and other parties in state court regarding the depletion of his trust assets. Regency also began collection actions. In January 1993, Regency foreclosed on some of Grady's other assets and received $12 million in a credit bid for an apartment building that Grady owned. Regency reduced the debt Grady owed under the promissory notes by this amount. On June 1, 1993, Grady paid Regency $25,000 to adjourn the foreclosure sale of the Chama stock until June 15.

On June 15, Grady filed a Chapter 11 bankruptcy petition. Kelso and LEI, Kelso's company, also filed Chapter 11 bankruptcy petitions, as did the other corporations (i.e., the Chama Estates) involved in the 1990 Transactions.

Although the parties filed these bankruptcy cases in different districts, the courts transferred them all to the bankruptcy court in the Northern District of Texas and consolidated them before Judge Abramson. The bankruptcy court appointed Walter O'Cheskey as the Chapter 11 Trustee ("Trustee") of the Chama Estates. Gary filed a proof of claim against Grady and the Chama Estates for approximately $70 million in damages (which included actual damages of about $25 million and multiple punitive damages claims). Regency also filed a proof of claim, seeking actual damages of about $11 million. Gary and Regency both claimed that Kelso had diluted Chama's value, making it worthless.

In January 1994, Regency filed an adversary proceeding asserting claims for damages against the parties involved in the 1990 Transactions. After dismissing some of the claims for lack of standing, the bankruptcy court held a trial on Regency's remaining claims. The court determined that Regency could not prevail on its causes of action, with the exception of a breach of contract claim against Grady. On appeal, the Trustee contends that the bankruptcy court did not actually make a final ruling on all of Regency's claims, as it never fully resolved Regency's claims for constructive fraud, breaches of statutory and equitable duties, and rescission. Nevertheless, Regency and the Trustee eventually settled the case for distributions under the Trustee's Chapter 11 liquidation plan (the "Trustee's Plan"), meaning that the bankruptcy court did not need to resolve these issues.

The bankruptcy court then oversaw the implementation of the Trustee's Plan. The court first approved the Trustee's sale of the Ranch assets to the Jicarilla Apache Tribe for $25.5 million. The Trustee then used this money as the basis for the reorganization of the Chama Estates. In conjunction with the Trustee's Plan, Grady filed a Chapter 11 plan of reorganization ("Grady's Plan"), and Antigone Corporation, one of entities that owned stock in the Chama Estates, also filed a Chapter 11 liquidation plan (the "Antigone Plan"). All

principal parties, except Kelso, joined in a settlement that included all three Chapter 11 Plans.** As part of the Trustee's Plan, the Trustee used the proceeds from the sale of the Ranch to pay off creditors. The Trustee's Plan provided that Gary and Regency, as the Class 6 "Settling Principals," were each entitled to approximately 48% of the residual proceeds from the Ranch after the Trustee paid the claims of creditors in Classes 1-5. The parties agreed to sign mutual releases of their claims in accordance with the Trustee's Plan. The releases also transferred all equity interests in the Chama Estates to the Trustee, who would dissolve the corporations.

The Trustee's Plan purposefully did not address the issue of the estate's federal tax liabilities. Instead, the Plan required the Trustee to seek a tax liability determination from the bankruptcy court under 11 U.S.C. § 505. The Plan acknowledged that the court would resolve any disputes regarding the allocation of payments and distributions and would determine whether the Trustee had made those payments on claims for damages (making them deductible expenses) or for a return of equity interests (which are not deductible).

On June 5, 1995, the Trustee closed the sale of the Ranch for $25.5 million. Upon receiving the funds, the Trustee estimated the tax liabilities under the assumption that none of the distributions were deductible and wrote three checks to the Internal Revenue Service ("IRS") for the debtors' potential federal income tax liabilities.

On July 28, 1995, the bankruptcy court held a confirmation hearing. The bankruptcy judge found that Gary suffered losses of more than $28 million. Under the Trustee's Plan, Gary received distributions from the Trustee of $7,559,615.00, although he received only $5,272,303.55 in 1995 and received the

---

** Kelso chose to litigate his claims with the bankruptcy estate, but the bankruptcy court eventually disallowed his claims.

remainder in 1996 and 1997. The bankruptcy judge concluded that Regency was due the same amount as Gary, as both were Class 6 creditors. Importantly, per the Trustee's Plan, the bankruptcy court did not allocate any portion of these distributions as payments for damages or equity, leaving that issue for a tax liability determination.

On September 30, 1996, the Trustee filed the debtors' 1995 federal income tax returns. The Trustee claimed damages deductions for some of the distributions to both Gary and Regency. Based on its accrual accounting method, the Trustee allocated all of the payments to Gary and Regency to the 1995 tax year, even though the Trustee had not distributed the full amount to them in 1995. In October 1996, the IRS issued a tax refund based on this tax return, but notified the Trustee that it would be examining the 1995 return.

The IRS ultimately concluded that the Trustee could not take the damages deductions in the 1995 tax return. On July 18, 1997, the Trustee filed a motion under 11 U.S.C. § 505 requesting that the bankruptcy court determine the debtors' 1995 income tax liabilities. On August 15, 1997, the IRS issued three notices of deficiency to the Trustee, disallowing the claimed deductions. The Trustee twice filed amended tax returns, increasing the claimed damages deductions for the distributions to Gary and Regency. The tax liability determination, which is the subject of this appeal, proceeded to a trial before the bankruptcy court.

## B. Procedural Background

### 1. First bankruptcy court ruling (Judge Abramson) (1999)

In March 1999, the bankruptcy court held a trial on the Trustee's motion to determine the debtors' tax liabilities. The court correctly noted that the Trustee bears the burden of proving an entitlement to a deduction. *See Woodall v. Comm'r*, 964 F.2d 361, 363 (5th Cir. 1992). The court held that the Trustee failed to meet this burden, concluding that all of the distributions to both Gary

and Regency were to redeem their equity interests in Chama and therefore were not deductible. For Gary, the court noted that he had executed a release of his claims for damages pursuant to the Trustee's Plan. For Regency, the court relied on its earlier conclusion that Regency could not prove any of its causes of action in its adversary proceeding against the Chama debtors and observed that Regency's lawyer admitted that Regency had "lost" the adversary proceeding. The court stated that "the rulings as to Regency were res judicata of its claims for damages; its only standing was that of a shareholder of Chama." *In re Am. Elk Conservatory, Inc.*, No. 393-38328-HCA-11 et al., at 44-45 (Bankr. N.D. Tex. Nov. 10, 1999). The court also chose not to consider any tax issues involving the 1996 or 1997 distributions.

In sum, the court held that the "[d]ebtors are liable for the income tax deficiencies proposed by the Notices of Deficiency to the Trustee for the 1995 year except for the appropriate adjustments to be made for deduction of New Mexico state income taxes when the federal income tax liabilities are finally determined." *In re Am. Elk Conservatory, Inc.*, No. 393-38328-HCA-11 et al., at 46.

### 2. First district court appeal (Judge Solis) (2001)

The Trustee appealed the bankruptcy court's order to the district court.[1] The district court issued a thirty-four page opinion on December 21, 2001, concluding that at least a portion of the Trustee's payments to Gary were attributable to the settlement of Gary's claims for damages, but that none of the payments to Regency were for damages. The court rejected the Trustee's argument that the bankruptcy court improperly relied upon its prior decision that Regency could not make out a cause of action in its adversary proceeding. The Trustee had argued that the bankruptcy court's failure to enter a final

---

[1] The Trustee made a conditional payment of taxes and interest to stay the judgment.

judgment for these claims meant that the court could not later rest upon its rejection of Regency's contention that the Trustee had paid it for damages. The district court responded that "[t]hough Regency's appeal period would not begin without a final judgment, any failure to comply with [Federal Rule of Civil Procedure] 58 [which requires every judgment to be set forth in a separate document] does not necessarily destroy the validity of the bankruptcy court's conclusion of *res judicata* on the matter." *O'Cheskey v. United States*, No. 3-00-CV-0142, 2001 WL 1658144, at *7 (N.D. Tex. Dec. 21, 2001). The court also noted that even if the bankruptcy court could not rely on its prior decision as res judicata, its conclusion that Regency could not make out a cause of action for damages was still persuasive for the tax liability determination.

Further, the court ruled that the bankruptcy court did not err in failing to credit its own prior statement that the value of Gary and Regency's claims if they went to trial exceeded the amounts they received under the Trustee's Plan. The Trustee had argued that the bankruptcy court's statements in this regard demonstrated that the payments were for damages, but the district court observed that the Trustee's reliance on this isolated statement was "misplaced." *Id*. at *8. The district court reiterated that Regency had lost its adversary proceeding against the debtors. Thus, the district court concluded that the bankruptcy court was not making a decision that the distributions to Gary and Regency were for damages for purposes of the Trustee's tax liabilities when the bankruptcy court noted that their claims likely exceeded the amount they would recover in the bankruptcy distribution.

Comparing Gary and Regency, the district court observed that they received the same amount under the distribution because Gary had a lower equity interest in Chama but a viable damages claim, while Regency had a larger equity interest in Chama but no possible damages. Therefore, the bankruptcy court had erred in not allocating some of the payments to Gary as

damages. However, the district court concluded that there was insufficient evidence in the record to determine how much of the payments to Gary were for damages. The district court therefore remanded the case to the bankruptcy court for an allocation of some of the distributions to Gary as damages.

With regard to the debtors' claimed net operating losses for tax years 1996 and 1997, the district court determined that the bankruptcy court did not abuse its discretion in choosing not to decide whether any net operating losses would "carry back" to the 1995 tax year. The court noted that the Trustee still could seek a Tax Court adjudication on this issue.

### 3. First remand to the bankruptcy court (Judge Abramson) (2002)

The bankruptcy court held a trial on remand regarding the calculation of the payments to Gary that constituted damages. In its written opinion, the court first renewed its previous conclusion that the payments to Gary were a return of equity. Nevertheless, "in the alternative, and out of respect for the District Court's Opinion that found that some of the distributions were for damages, the Court finds that of the $2,905,338, the sum of $198,718.17 was in payment of damages and thus deductible as an ordinary and necessary business expense." *In re Am. Elk Conservatory, Inc.*, No. 93-38330-HCA-11, 2002 WL 31934160, at *2 (Bankr. N.D. Tex. Nov. 1, 2002). The bankruptcy court derived the number $198,718.17 from a calculation involving attorneys' fees.

### 4. Second district court appeal (Judge Kinkeade) (2004)

On appeal of the bankruptcy court's ruling, the district court concluded that the bankruptcy court had

> refused to permit the Trustee to present evidence relevant to the allocation of distributions to Gary Vaughn, yet stated in its opinion on remand that the Trustee's lack of evidence as to Gary Vaughn's damages supported its refusal to find that the majority of the Trustee's distributions to Gary Vaughn were for his tort claims.

9

*O'Chesky*[2] *v. United States*, No. 3:04-CV-0137, 2004 WL 2397286, at *1 (N.D. Tex. Sept. 13, 2004). The district court noted that the record still lacked evidence as to the proper allocation of the distributions to Gary, so it remanded to the bankruptcy court "for the express purpose of receiving evidence from the parties regarding the allocation of the distributions made to Gary Vaughn." *Id.*

5. *Second remand to the bankruptcy court (Judge Houser) (2005)*

Because Judge Abramson had retired, Judge Houser heard the case on the second remand. *See In re Am. Elk Conservatory, Inc.*, No. 393-38328-BJH-11, et al., 2005 WL 1441785 (Bankr. N.D. Tex. May 20, 2005). The bankruptcy court concluded that the Trustee was entitled to a tax refund of $1,980,081 for 1995. *In re Am. Elk Conservatory, Inc.*, No. 393-38328-BJH-11 et al., 2005 WL 3099926, at *1 (Bankr. N.D. Tex. Oct. 17, 2005). The court treated as deductible damages all of the distributions to Gary in 1995, 1996, and 1997, except those for debt repayment. The court made an alternative holding that if the scope of the remand was only for the distributions that Gary actually received in 1995, then the Trustee was entitled to a tax refund of $1,508,564. *Id.* at *2. The bankruptcy court also determined that the Trustee was not entitled to a deduction for unpaid New Mexico state taxes for 1995, as the amount of those unpaid taxes depended on the amount of federal tax liability, which had not yet been determined. *Id.* at *4.

6. *Third district court appeal (Judge Lindsay) (2007)*

Both parties appealed the bankruptcy court's decision on the second remand. *See United States v. O'Cheskey*, No. 3:05-CV-2468, 2007 WL 2907821 (N.D. Tex. Oct. 5, 2007). The district court first affirmed the bankruptcy court's conclusion regarding the distributions to Gary in 1995, ruling that all of the distributions except those for debt repayment were for damages. The district

---

[2] The district court misspelled O'Cheskey's name in its caption.

court reversed the bankruptcy court, however, with regard to the distributions to Gary in 1996 and 1997, concluding that the court's allocations for those years exceeded the scope of the second remand.

Finally, the court upheld the bankruptcy court's ruling that the Trustee was not entitled to a deduction for unpaid New Mexico state taxes, because the amount of that liability was not ascertainable with reasonable accuracy until the parties resolved the federal tax liability.

### 7. *Appeal to the Fifth Circuit*

Both parties appealed the district court's order to this court. However, the United States dismissed its appeal on December 3, 2007. Therefore, only the Trustee's appeal remains.

The Trustee appeals three rulings: (1) the lower courts' conclusions that the payments to Regency were for a return of equity and therefore are not deductible, (2) the district court's decision that the bankruptcy court exceeded the scope of the remand when it included the 1996 and 1997 payments to Gary in its calculations, and (3) the district court's ruling regarding the unpaid 1995 New Mexico state taxes.

## II. JURISDICTION AND STANDARD OF REVIEW

The bankruptcy court had jurisdiction over the Trustee's motion for a determination of tax liability pursuant to 28 U.S.C. § 157(b)(2)(A) & (O). The district court had jurisdiction over the appeals of the bankruptcy court's decisions pursuant to 28 U.S.C. § 158(a). We have jurisdiction over the appeal of the district court's final judgment pursuant to 28 U.S.C. § 158(d).

This court "applies the same standard of review to the decisions of a bankruptcy court as does the district court." *Plunk v. Yaquinto (In re Plunk)*, 481 F.3d 302, 305 (5th Cir. 2007). Therefore, we must review findings of fact for clear error and conclusions of law de novo. *Id.*

11

The allocation of distributions for tax liability purposes is a finding of fact that we review for clear error. *Robinson v. Comm'r*, 70 F.3d 34, 38 (5th Cir. 1995). Interpreting the proper scope of review on remand is a question of law that we review de novo. *United States v. Lee*, 358 F.3d 315, 320 (5th Cir. 2004). Whether a taxpayer has satisfied the "all events" test (for the issue regarding the unpaid 1995 New Mexico state taxes) is also a question of law that we review de novo. *See Interex, Inc. v. Comm'r*, 321 F.3d 55, 58 (1st Cir. 2003).

## III.  DISCUSSION

### A.  Distribution to Regency: Return of Equity or Payment of Damages

The Internal Revenue Code allows a taxpayer to take a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." I.R.C. § 162(a). By contrast, a taxpayer may not take a deduction for "capital expenditures." I.R.C. § 263. If the Trustee's payments to Regency were for a return of equity, then they were capital expenditures that are not subject to a deduction. *See United States v. Houston Pipeline Co.*, 37 F.3d 224, 226 (5th Cir. 1994) ("Stock redemptions, as a general rule, are characterized as capital transactions, and the purchase price of a stock redemption is not deductible." (footnotes omitted)). If the payments were for damages, however, then the Trustee could deduct them on the debtors' tax returns so long as the expenses were "ordinary and necessary." *See Green v. Comm'r*, 507 F.3d 857, 871 (5th Cir. 2007). The Trustee bears the burden of proof in challenging the IRS's disallowance of a deduction. *See Woodall*, 964 F.2d at 363.

A determination of whether a payment is for damages or is for the exchange of stock is generally dependent on the payor's intent. *See Srivastava v. Comm'r*, 220 F.3d 353, 365-66 (5th Cir. 2000), *overruled on other grounds by Comm'r v. Banks*, 543 U.S. 426 (2005). "When determining the tax treatment of a settlement, we must ask[,] 'in lieu of what was the . . . settlement awarded?'"

12

*Green*, 507 F.3d at 867 (quoting *Srivastava*, 220 F.3d at 365) (omission in original). Although the court first looks to the language of the settlement agreement—here the Trustee's Plan—"[w]here the settlement agreement lacks express language of purpose, the court looks beyond the agreement to other evidence that may shed light on the intent of the payor as to the purpose in making the payment." *Id.* (internal quotation marks omitted). The Trustee's Plan left the question of how to allocate the distributions to the bankruptcy court in a proceeding pursuant to 11 U.S.C. § 505.

The Trustee challenges the lower courts' determinations that the 1995 payments were a return of Regency's equity. The basis of the Trustee's argument is that both Gary and Regency asserted claims for damages against the Chama Estates, so it makes little sense to treat the distributions to Gary and Regency differently, especially as they each received the same amount. The Trustee asserts that the whole point of the Trustee's Plan was to bring the debtors' cases to a conclusion, which required that the Trustee settle all outstanding litigation. Thus, the distributions enabled the settlement of both Gary's and Regency's claims. As the bankruptcy court stated, "it was Gary's unliquidated claims (along with those of other litigants) that were the obstacle to a viable plan of reorganization for the Debtors that could bring the Debtors' cases to a conclusion and insure that creditors were paid." *In re Am. Elk Conservatory, Inc.*, 2005 WL 1441785, at *4. The Trustee asserts that the same analysis should apply with respect to Regency. In particular, the Trustee points to the statements that the bankruptcy court made indicating that both Gary and Regency received less in the distribution than they would have had they pursued their claims, suggesting that the payments to both of them were for damages. The Trustee contends that this was the "law of the case," and that a later ruling that Regency did not suffer any damages contradicts this finding.

Finally, the Trustee notes that Regency owned a 68.8% interest in Chama's stock, and that after the 1990 Transactions, the stock was worth nothing. The Trustee sold Chama's main asset, the Ranch, for $25.5 million, which the Trustee asserts supports a conclusion that Regency suffered at least $17 million in damages (68.8% of $25.5 million). Moreover, the Trustee's outside accountant testified that his initial calculation of Regency's damages was based on the difference between its ownership of Chama's equity (68.8%) and the percentage Regency received in the distribution (48%), meaning that Regency suffered at least 20% in damages.

What the Trustee fails to appreciate, however, is that Regency lost its adversary proceeding against the Chama Estates, meaning that the bankruptcy court had previously determined that Regency did not suffer any damages. Regency's lawyer admitted during the confirmation hearing for the Trustee's Plan that Regency had lost its claims for damages against the debtors. The Trustee's argument that the bankruptcy court improperly gave preclusive effect to this finding without making it a final judgment is unavailing, particularly given that the lack of a separate judgment under Bankruptcy Rule 9021 and Federal Rule of Civil Procedure 58 does not prevent a court from considering the issue final if the parties evinced the intent to treat the order as final. *See In re Seiscom Delta, Inc.*, 857 F.2d 279, 285 (5th Cir. 1988); *Nagle v. Lee*, 807 F.2d 435, 441-42 (5th Cir. 1987). The Trustee did not attempt to appeal the bankruptcy court's order, even though the Trustee filed a motion for an entry of judgment. This failure to appeal, along with Regency's lawyer's admission that Regency had lost in the adversary proceeding, evinces an intent to consider the bankruptcy court's decision final. *See In re Seiscom Delta, Inc.*, 857 F.2d at 285; *Nagle*, 807 F.2d at 441-42.

Further, as the district court noted, even if the bankruptcy court should not have given preclusive effect to its prior finding, it still could use the ruling

as persuasive evidence that Regency had not suffered any damages. The Trustee fails to explain why the district court clearly erred in relying on this ruling, particularly if the court simply considered it as persuasive.

As additional evidence to support the district court's conclusion, Regency did not treat the distributions as damages on its own tax return. There is also an eminently plausible explanation for the different treatment of Gary and Regency, even though they ultimately received the same distribution: Gary suffered damages exclusive of those related to his stock interest in Chama, such as losses from his trust fund and lost earnings from other oil and gas properties that Kelso had improperly transferred to the Chama Estates. With regard to the bankruptcy court's statement at the confirmation hearing that Regency's claims were worth more than it would receive in a distribution, the same bankruptcy judge who made that statement (Judge Abramson) noted in this proceeding that there were no final judgments establishing the existence of damages and that the statement in the confirmation hearing was pursuant to a finding that the settlement was reasonable. In light of the scant contrary evidence regarding the payor's intent, these facts, in combination, support the lower courts' decisions.

In sum, there were sufficient facts for the bankruptcy court to conclude that the distribution to Regency was for a return of equity. Accordingly, the Trustee has failed to demonstrate that the district court clearly erred in upholding the bankruptcy court's conclusion, and we affirm the district court's decision on this issue.

## B. Scope of the Remand

Although the district court, in the third appeal, affirmed the bankruptcy court's conclusion that the 1995 payments to Gary were for damages, the court ruled that the bankruptcy court erred in considering the 1996 and 1997 payments because they were beyond the scope of the prior remand from the district court. The Trustee asserts that this was error. This issue impacts the

amount of deductions the Trustee can take for the payments to Gary, as I.R.C. § 172(b)(1)(A)(i) allows a taxpayer to "carryback" an entity's net operating losses for the "two taxable years preceding the taxable year of such loss."

In the bankruptcy court's first ruling, the court held that the payments to both Gary and Regency were for a return of equity. The court also expressly declined to consider the possible net operating loss carrybacks for 1996 and 1997. In the first appeal, the district court ruled that a portion of the Trustee's payments to Gary were attributable to the settlement of Gary's claims for damages. The district court also upheld the bankruptcy court's decision not to consider the possible carrybacks, as the word "may" in 11 U.S.C. § 505 "appears intended to grant the bankruptcy court discretion as to whether it will determine taxes." *O'Cheskey*, 2001 WL 1658144, at *18. The court held that the bankruptcy court did not abuse its discretion, particularly given that the Trustee still could pursue a Tax Court adjudication for these years. The district court's remand order read as follows: "The case is remanded to the bankruptcy court for calculation of the amount of the payments to Gary that were for damages claims and for determination of the Trustee's tax liability in accordance with this order. In all other respects the order of the bankruptcy court is affirmed." *Id.* at *21. Neither the bankruptcy court in the first remand nor the district court in the second appeal considered the possible effect of the net operating loss carrybacks. The district court's second remand order stated that it was remanding the case "for the express purpose of receiving evidence from the parties regarding the allocation of the distributions made to Gary Vaughn." *O'Chesky*, 2004 WL 2397286, at *1.

In the second remand, the bankruptcy court calculated the Trustee's tax liability based on the distributions to Gary for damages. The bankruptcy court determined the Trustee's taxes while including the payments to Gary for 1996 and 1997, but also provided an alternative holding in case the remand was

16

limited to the 1995 payments. In the third appeal, the district court held that the bankruptcy court's calculations that included the 1996 and 1997 payments were beyond the scope of the remand. The court's entire analysis of this issue is as follows:

> IRS first argues that the bankruptcy court erred in exceeding the scope of remand when it held that all distributions to Gary were for damages. According to IRS, the 1996 and 1997 tax years were not before the bankruptcy court on this remand. The court agrees.
>
> This litigation began in 1997 when Trustee filed a motion with the bankruptcy court to determine the federal income tax liability for Chama Estates for the 1995 tax year. When the court remanded this case to the bankruptcy court "for calculation of the amount of the payments to Gary that were for damages claims and for determination of the Trustee's tax liability," the 1995 tax year was the only year before the court. The 1996 and 1997 tax years were only visited by the court for the purpose of determining the losses available for carryback to reduce the taxable income for the Chama Estates for tax year 1995. The 1996 and 1997 tax year disputes were (and remain) pending in Tax Court. The court held that the bankruptcy court did not abuse its discretion in declining to decide the 1996 and 1997 net operating losses. Therefore, the bankruptcy court exceeded the scope of remand and erred in characterizing the 1996 and 1997 payments to Gary as damages.

*O'Cheskey*, 2007 WL 2907821, at *6-7.

The Trustee argues that the district court erred in this conclusion, because, he contends, the bankruptcy court was free to consider the possible carryback effects of net operating losses for 1996 and 1997. In the appellate context, "[t]he mandate rule requires a district court on remand to effect our mandate and to do nothing else. Further, on remand the district court must implement both the letter and the spirit of the appellate court's mandate and may not disregard the explicit directives of that court." *Gen. Universal Sys. v. HAL Inc.*, 500 F.3d 444, 453 (5th Cir. 2007) (internal quotation marks and citations omitted). Bankruptcy courts are subject to the mandate rule. *See Jam.*

*Shipping Co. v. Orient Shipping Rotterdam, B.V. (In re Millenium Seacarriers, Inc.)*, 458 F.3d 92, 97 (2d Cir. 2006).

The district court in the first appeal was correct to hold that the bankruptcy court did not abuse its discretion in choosing not to consider the 1996 and 1997 net operating losses. *See* 11 U.S.C. § 505(a)(1) ("Except as provided in paragraph (2) of this subsection, the court *may* determine the amount or legality of any tax . . . ." (emphasis added)). However, this ruling does not mean that the bankruptcy court could not, in its discretion, consider the 1996 and 1997 carryback issue on remand. The district court did not hold that the bankruptcy court was precluded from analyzing this issue; it merely stated that the bankruptcy court had not abused its discretion in its first ruling by choosing not to consider it. Moreover, the remand orders did not prevent the bankruptcy court from considering the 1996 and 1997 issues that impact the 1995 tax liabilities. Instead, the district court remanded the case (twice) for a calculation of the amount of distributions that Gary received as damages. Based on the carryback rule in I.R.C. § 172(b)(1)(A)(i), this calculation could include, if the bankruptcy court chose to consider it based on its discretionary powers under 11 U.S.C. § 505, the net operating losses for the two subsequent years.

The language the district court used to remand the case to the bankruptcy court was sufficiently broad to include the 1996 and 1997 distributions. This is particularly true given that it would have been unnecessary for the bankruptcy court to analyze the carryback issue in its first order after concluding that none of the payments to Gary were for damages. That is, the carryback issue became relevant only after the district court ruled that at least some of the distributions to Gary were for damages. Accordingly, the district court erred in holding that the bankruptcy court, in the second remand, exceeded the scope of the remand, because the remand never restricted the bankruptcy court from considering the

1996 and 1997 carrybacks. We therefore reverse and remand for a calculation of the tax refund due the Trustee when including the 1996 and 1997 carrybacks.

## C. Qualified Settlement Fund

Throughout this litigation, the parties have disputed whether the Trustee made some of its payments from a valid Qualified Settlement Fund ("QSF"). A QSF is a mechanism that allows a taxpayer to deduct payments in the year that the taxpayer established the QSF, even if the fund itself does not actually make those payments until subsequent years. *See* 26 C.F.R. § 1.468B-2. The district court concluded that the Trustee created two QSFs in 1995.[3] With respect to the 1996 and 1997 distributions to Gary, the government asserts that if we reverse the district court regarding the scope of the remand—making these payments deductible—then we should also reverse the district court's conclusion that the Trustee had established two QSFs in 1995, from which it made the 1996 and 1997 payments.[4]

However, we are unable to reach the merits of the government's contention because it waived its argument when it dismissed its appeal in this case. The government attempts to avoid this outcome by noting that "[e]ven though an appellee has not filed a cross appeal, he may take the position on appeal that the

---

[3] The bankruptcy court originally ruled that the Trustee had failed to prove the requirements of a QSF. The district court in the first appeal reversed this finding. The district court in the third appeal subsequently ruled that the Trustee could not deduct the payments to Regency as payments from a QSF because the Trustee had paid Regency for a return of equity, not damages. The district court in the third appeal also determined that the payments to Gary satisfied the requirements of a payment from a QSF, but noted that this designation was unavailable for the 1995 payments and refused to consider the payments from 1996 or 1997 because they were beyond the scope of the remand.

[4] Given that the district court did not err in upholding the bankruptcy court's conclusion that the payments to Regency were for a return of equity, we need not reach the QSF issue with respect to the payments to Regency. This is because QSF status is relevant only to whether the Trustee can take a deduction, which is possible here only if the Trustee's distributions to Regency were to pay for damages. *Cf.* 26 C.F.R. § 1.468B-2(k) (treating a QSF like a corporation for tax purposes).

record supports the court's judgment on any ground, including one rejected or ignored in the lower court." *Hoyt R. Matise Co. v. Zurn*, 754 F.2d 560, 565 n.5 (5th Cir. 1985). The government is not seeking an alternate ground, however, to support the district court's ruling, but instead is specifically asking this court to reverse the district court's holding on this point. That is, the district court explicitly held that the Trustee had established two QSFs, and the government attacks that holding even though it already dismissed its appeal in this case. Accordingly, we cannot consider the government's argument, as it did not appeal the district court's order on this issue.

## D. Unpaid New Mexico State Taxes for 1995

In the first remand at the bankruptcy court, the court held that the Trustee was entitled to take a deduction of $651,177 for the state taxes he had paid to New Mexico in 1995. Because the government dismissed its appeal in this case, the deduction for the taxes the Trustee already paid is not at issue. However, in the second remand to the bankruptcy court, the court held that the Trustee was not entitled to a deduction for the additional, but still unpaid, New Mexico state taxes. The court held that

> the full amount of the New Mexico state tax liability was not fixed in 1995 under the so-called "all events" test because the amount of the liability could not be determined with reasonable accuracy. The state tax liability could not be fixed at that time because it piggybacks the underlying federal tax liability which was contested by the Trustee (and still remains in dispute). When the federal tax liabilities are finally adjudicated, the amount of the New Mexico state income taxes can be determined and the Debtors will be entitled to a deduction in that year.

*In re Am. Elk Conservatory, Inc.*, 2005 WL 3099926, at *2. The district court in the third appeal affirmed this ruling, noting that "[i]t is not possible to determine the amount of the state tax liability with reasonable certainty until

the federal income tax liability is established." *O'Cheskey*, 2007 WL 2907821, at *9. The Trustee appeals this conclusion.

As an accrual-based taxpayer, the Trustee (on behalf of the debtors), may deduct an expense from federal income tax "in the taxable year in which [(1)] all the events have occurred that establish the fact of the liability, [(2)] the amount of the liability can be determined with reasonable accuracy, and [(3)] economic performance has occurred with respect to the liability." 26 C.F.R. § 1.461-1(a)(2)(i); *see also* I.R.C. § 461(h)(1) ("For purposes of this title, in determining whether an amount has been incurred with respect to any item during any taxable year, the all events test shall not be treated as met any earlier than when economic performance with respect to such item occurs."); § 461(h)(4) ("For purposes of this subsection, the all events test is met with respect to any item if all events have occurred which determine the fact of liability and the amount of such liability can be determined with reasonable accuracy."); *United States v. Anderson*, 269 U.S. 422, 441-42 (1926).

The district court noted that the parties did not dispute that all events had occurred to establish the *fact* of the New Mexico state tax liability, meeting the first prong of the test. The court also determined that the Trustee had met the third prong, finding that there was economic performance for the unpaid state income tax liability. However, regarding the second prong, the court ruled that the *amount* of the liability could not be determined with reasonable accuracy. This conclusion rested on an interpretation of *Consolidated Industries, Inc. v. Commissioner*, 82 T.C. 477 (1984), *aff'd per curiam*, 767 F.2d 41 (2d Cir. 1985). In *Consolidated Industries*, the Tax Court considered whether an accrual-method corporate taxpayer could deduct from its 1976 federal taxes additional Connecticut state taxes due for 1976, which stemmed from an adjustment in 1983 to the taxpayer's 1976 federal taxes. *Id.* at 478. The court noted that if a tax adjustment is contested, "accrual of the deduction must be deferred until

21

either the dispute is resolved or the liability is paid." *Id*. at 480. The court reasoned that based on Connecticut's tax structure, "Federal tax liability and Connecticut tax liability . . . inevitably move in tandem. Accordingly, contest of a Federal tax deduction is effectively a contest of the State tax liability." *Id*. at 482. The court held that the taxpayer could not deduct the additional state taxes for 1976 because, by asserting a contest to its federal taxes, it was also challenging its state taxes, meaning that a dispute regarding the state taxes had not been resolved. *Id*. at 483. The taxpayer therefore could take the deduction only in the year it resolved the federal contest. *See Consol. Indus., Inc.*, 767 F.2d at 42. Based on this decision, the district court here ruled that because the state and federal tax liabilities "move[d] in tandem," "a contest of one is necessarily a contest of the other, and the amount of a contested liability cannot be determined with reasonable accuracy." *O'Cheskey*, 2007 WL 2907821, at *9 (citing *Consol. Indus., Inc.*, 82 T.C. at 482).

The Trustee attempts to distinguish *Consolidated Industries* by noting that the corporation in that case was not in bankruptcy but was an ongoing business entity that could recoup the additional tax payments in subsequent years. However, the court in *Consolidated Industries* did not rest its holding on the fact that the taxpayer was a solvent corporation. Instead, the court simply stated that the state taxes were dependent on the federal taxes, and therefore that the taxpayer could not take a deduction for the state taxes until the federal tax contest had fixed the state tax liability. *Consol. Indus., Inc.*, 82 T.C. at 482. There is no basis for concluding that the outcome in *Consolidated Industries* would have been different had the corporation been insolvent.

The Trustee also cites *Snider v. Commissioner*, 453 F.2d 188 (5th Cir. 1972), in an attempt to bolster his argument. There, this court considered whether an accrual-based partnership could deduct a loss in 1965, when it entered into a contract to sell its lumber mill, or if it had to take the deduction

in 1966, when it delivered the bill of sale and received the money. *Id.* at 189. The court focused on "the contract of sale, the agreement on lease terms, and the fixing with reasonable accuracy of the amount of the loss on the sale, all of which had occurred by 5:00 p.m. December 31, 1965." *Id.* at 190. The court explicitly held that the amount of the deduction "could be determined with . . . virtually precise accuracy" in 1965, especially because "at 5:00 pm on December 31, 1965, . . . the Partnership closed its books and ceased to do business." *Id.* at 191 (internal quotation marks omitted). Thus, the January closing of the sale was "a formality rather than the event that fixed the liability of the parties." *Id.* at 192.

*Snider* does not assist the Trustee. Here, the amount of unpaid New Mexico state taxes has never been fixed, which is unlike the amount of loss that the partnership incurred based on the sale of the lumber mill. The amount of the New Mexico state taxes is wholly dependent on the federal tax liability. Thus, although there is no dispute that the Trustee will be liable for the state taxes, the amount still must be ascertained based on the Trustee's federal tax liability for 1995.

Accordingly, the Trustee cannot meet the all events test of 26 C.F.R. § 1.461-1(a)(2)(i). Even if all of the events have occurred to establish the fact of the liability, and even if economic performance occurred with respect to the liability, the amount of the liability cannot be determined with reasonable accuracy until the federal tax issues are resolved. Therefore, we affirm the district court's decision on this issue.

## IV. CONCLUSION

We AFFIRM the district court's decision that the distributions to Regency were for a return of equity and therefore are not deductible; REVERSE the district court's judgment that the bankruptcy court exceeded the scope of the remand and REMAND for a calculation of the Trustee's taxes when taking into

account the relevant 1995, 1996, and 1997 payments; and AFFIRM the district court's decision that the Trustee cannot deduct the unpaid New Mexico state taxes from his 1995 federal taxes.

AFFIRMED IN PART; REVERSED IN PART, REMANDED.